Terry R. WEST, Plaintiff
and Respondent,

v.

THOMSON NEWSPAPERS, dba The Daily Spectrum; Don E. Hogun; Brent Goodey; and Rick Guldan, Defendants and Petitioners.

No. 920276.

Supreme Court of Utah.

March 22, 1994.

Rehearing Denied May 5, 1994.

Terry R. West, pro se.

Randy L. Dryer, David W. Zimmerman, Salt Lake City, for defendants and petitioners.

Patrick A. Shea, Salt Lake City, for amicus Soc. of Professional Journalists.

DURHAM, Justice:

This case is before the court on a petition for a writ of certiorari to the Utah Court of Appeals. Plaintiff, the mayor of a small, southern Utah town, claims that a local newspaper published defamatory statements about him in a series of three editorial columns. The columns criticized the mayor for changing his political position on an important local issue and for attempting to "manipulate the press." The trial court dismissed the mayor's claims prior to trial. The court dismissed the claims relating to the manipulation statement on the ground that the statement was not capable of sustaining a defamatory meaning. The court ruled that the statements regarding the mayor's change of position were expressions of opinion protected by the First Amendment. In addition, the court found that the change-of-position statements were not published with actual malice, as required by *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny. The mayor appealed those rulings to the court of appeals, and that court reversed. We granted certiorari to review the court of appeals' decision. We reverse and hold that the manipulation statement is not defamatory as a

matter of law and that the change-of-position statement is protected opinion under article I, sections 1 and 15 of the Utah Constitution.

I

The following facts are not in dispute. Plaintiff Terry R. West is the mayor of La Verkin, Utah. Defendant Donald Hogun is the publisher of *The Daily Spectrum*, a newspaper circulated primarily in southern Utah. Defendant Brent Goodey is *The Daily Spectrum*'s managing editor. Defendant Rick Guldan was at all relevant times a reporter for *The Daily Spectrum* and also author of a weekly column. (Hogun, Goodey, and Guldan are collectively referred to as "defendants.") Guldan's weekly column appeared on *The Daily Spectrum*'s editorial page alongside his byline and photograph. In his column, Guldan commented on local, regional, and national issues. He often used his column as a vehicle to criticize local politicians and government leaders.

This lawsuit arose from three columns published in *The Daily Spectrum* in June, July, and November of 1988. The first appeared on June 27, 1988 (the "June column"). In this installment of Guldan's column, he criticized West for several acts, including (i) telling La Verkin citizens of the need to bring business into the community while simultaneously locating his own business in another city; (ii) maintaining a Wyoming driver's license even though he is a Utah resident; (iii) using dealership license plates on his private automobiles; and (iv) helping a friend obtain a conditional use permit after a city council meeting.

Guldan leveled two additional criticisms against West. These criticisms serve as the basis for West's claims relating to the June column. First, Guldan discussed West's political position on the hotly contested issue of whether La Verkin should purchase a municipal power system.[1] Guldan stated the following:

Terry West says the city council should listen to the people. The people spoke last November in a general election on the issue of municipal power. The people said they didn't want it, and Terry West, when running for mayor, was opposed to it. However the first thing West did as mayor was ignore the wishes of the people (claiming they weren't qualified to make that decision) and reactivate[ ] the municipal power issue. Apparently West believes you should only listen to the people when they agree with you.

Second, Guldan stated that West had a problem "keeping his 'facts' straight." As an example, Guldan stated that following the burglary of a business owned by West, he initially told police that nothing was stolen but later reported that $7,000 worth of rugs were missing. According to Guldan, West then filed an insurance claim in which he valued the rugs at $13,000. Goodey reviewed and approved the June column prior to publication. He did not independently investigate the accuracy of the factual assertions contained in the article, but relied instead on Guldan's research. Hogun did not review the June column prior to publication. Both Goodey's and Hogun's actions were consistent with the newspaper's editorial policy.

Shortly after its publication, West contacted Hogun to discuss the June column. West claimed that the column contained several inaccurate statements, including its reference to filing an excessive insurance claim. West explained to Hogun the facts surrounding the insurance claim. Thereafter, Hogun met with the newspaper's attorney, Tim Anderson, to discuss West's claim. Anderson reviewed the entire column and advised Hogun that the newspaper should publish a retraction of the statement concerning the insurance claim. On June 30, 1988, the newspaper retracted the statement.

Following the retraction, West again met with Hogun to discuss the column. Among other things, West stated that he had not changed his position on municipal power and had supported it while running for mayor. West showed Hogun a letter that he claimed

---

1. Prior to the mayoral election, La Verkin residents had voted not to purchase a municipal power system. The vote apparently did not resolve the controversy. The mayoral candidates campaigned on this issue and, according to West, many residents cast their votes for mayor solely on the candidate's announced position on municipal power.

was sent to La Verkin citizens prior to the election which set forth his pro-municipal power position. West also gave Hogun a letter to the editor in which he refuted, point by point, the criticisms leveled in the June column.

Hogun met with Goodey and Anderson to discuss the June column and West's letter to the editor. Anderson advised Hogun that he should publish West's letter and include an editor's note again clarifying the statements concerning the insurance claim. Anderson also advised Hogun that it was not necessary to retract any other statements contained in the June column because they were expressions of Guldan's opinion.

On July 2, 1988, the newspaper published West's letter on its op-ed page. Guldan's weekly column appeared on the same page adjacent to West's letter (the "July column"). In the July column, Guldan responded to the issues raised in West's letter to the editor. Among other things, Guldan stated the following:

> I said Mayor West had been opposed to municipal power during the election. The mayor claims he never took that position. Several La Verkin citizens however, have told me that prior to the election they were under the impression West was opposed to municipal power, which is why they voted for him.
>
> ... If West never actually came out before the election and said he was opposed to municipal power, he certainly did a masterful job of creating an illusion he was.

Anderson reviewed the July column prior to publication and did not recommend any changes, nor did he advise the newspaper against publication. Although Hogun and Goodey did not read the column, they relied on Anderson's advice and likewise approved it for publication.

Several months later, Goodey wrote a column entitled "How I came to 'love' La Verkin's mayor" (the "November column"). The November column appeared on the newspa-

per's editorial page alongside Goodey's photograph and byline, which identified him as the newspaper's managing editor. In this column, Goodey discussed the ongoing relationship between *The Daily Spectrum,* West, and La Verkin planning commission chairman Phil Phillips. Goodey described an apparently longstanding and bitter political conflict between West and Phillips. He also described how each had responded to, and attempted to influence, stories printed in *The Daily Spectrum.* Goodey claimed that Phillips had often provided the newspaper with "tips" concerning some impropriety by West, many of which turned out to be unfounded. West, on the other hand, had accused the newspaper of being biased against him and supportive of Phillips. In summarizing the overall tenor of West's and Phillips' actions, Goodey stated, "The problem I have with the two gentlemen is their repeated, and not to [sic] subtle, attempts to manipulate the press."

West sued Hogun, Goodey, and Guldan for defamation based upon statements in the three columns.[2] West claimed that the following two statements in the June column were defamatory: (i) the assertion that West changed his position on municipal power; and (ii) the claim that West "couldn't keep his facts straight" concerning the recent burglary at his store. With respect to the July column, West claimed that republishing the change-of-position statement was defamatory. Finally, West sued Goodey and Hogun for the manipulation statement in the November column.

In November 1989, the trial court dismissed the claims against Hogun and Goodey arising from the November column. It found that the manipulation statement was not capable of sustaining a defamatory meaning and therefore West had failed to state a claim upon which relief could be granted.

Defendants then moved for summary judgment on the remaining claims. In July 1990, the trial court dismissed the claims against Guldan arising from the change-of-position statements in the June and July columns on

---

**2.** West amended his complaint three times during the course of the proceeding below. None of these amendments added additional parties or

additional claims or changed the basic nature of the initial claims.

the basis that the statements were expressions of opinion protected by the First Amendment. The court also dismissed the claims against Hogun and Goodey arising from the change-of-position statements in the June and July columns on the ground that they did not publish the statements with actual malice. The court declined to dismiss West's claim against Guldan for the burglary statement, finding that it was a statement of fact, not opinion, and that West had properly pleaded actual damage. However, the court found that the newspaper had adequately retracted the burglary statement and that these remedial steps effectively limited West's eventual recovery, if any, from Guldan.

West then requested that the trial court reconsider its ruling in light of *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), which recently had been decided by the United States Supreme Court. Defendants opposed reconsideration on the grounds that the court's ruling was consistent with the principles articulated in *Milkovich* and that reconsideration was unnecessary in light of an independent state law basis for the decision. In October 1990, the court ruled on West's motion. The court applied the *Milkovich* standard and concluded that the statements regarding West's position on municipal power were properly dismissed because they did not contain a provably false factual connotation. *See Milkovich*, 497 U.S. at 20–22, 110 S.Ct. at 2707. The court reasoned that it would be impossible for anyone, other than West himself, to know West's position on municipal power prior to the election.

In sum, the trial court granted defendants' summary judgment motion and dismissed (i) West's claims against Guldan arising from the change-of-position statements in the June and July columns because they were protected opinion, and (ii) all claims against Hogun and Goodey arising from the June and July columns on the ground that they did not publish the statements with actual malice. The court had previously granted defendants'

motion to dismiss West's claims stemming from the manipulation statement in the November column on the ground that the statement was not capable of sustaining a defamatory meaning. The claim against Guldan arising from the burglary statement in the June column remains before the trial court.

West appealed the trial court's rulings to the court of appeals.[3] A majority of the panel held the following: (i) The opinion privilege set forth in *Milkovich* did not apply to Guldan's statements in the June and July columns concerning West's change of position on municipal power; (ii) the trial court correctly ruled that Hogun and Goodey did not publish the June column with actual malice; (iii) whether Hogun and Goodey published the July column with actual malice was a question of fact to be resolved by the jury; and (iv) the manipulation statement was capable of sustaining a defamatory meaning. *West v. Thomson Newspapers*, 835 P.2d 179, 186, 189, 190–91 (Utah Ct.App.), *cert. granted*, 843 P.2d 1042 (Utah 1992). Thus, the court of appeals reversed all of the trial court's rulings with the exception of the claims against Hogun and Goodey arising from the June column's change-of-position statement. Judge Garff dissented. According to Judge Garff, none of the statements at issue were capable of sustaining a defamatory meaning and dismissal was therefore appropriate. 835 P.2d at 191 (Garff, J., dissenting). We granted defendants' petition for certiorari.

## II

■ Because some of West's claims were dismissed following summary judgment and others pursuant to a motion to dismiss, we recite the standards of review for both. Summary judgment is properly granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *Butterfield v. Okubo*, 831 P.2d 97, 101 (Utah 1992); *Winegar v. Froerer Corp.*, 813 P.2d 104, 107 (Utah 1991); *Mountain States Tel. & Tel. Co. v. Garfield County*, 811 P.2d

---

3. The court of appeals held that the appeal was proper under rule 54(b) of the Utah Rules of Civil Procedure. *West v. Thomson Newspapers*, 835 P.2d 179, 183 (Utah Ct.App.), *cert. granted*, 843 P.2d 1042 (Utah 1992).

184, 192 (Utah 1991). When there are no disputed issues of material fact, a challenge to summary judgment presents only a question of law, which we review for correctness. *See Society of Separationists v. Whitehead,* 870 P.2d 916, 920 (1993); *Schurtz v. BMW of N. Am., Inc.,* 814 P.2d 1108, 1111–12 (Utah 1991); *Mountain States,* 811 P.2d at 192.

■ When reviewing the propriety of granting a motion to dismiss for failure to state a claim upon which relief may be granted, we accept as true all material allegations contained in the complaint and all reasonable inferences drawn therefrom. Utah R.Civ.P. 12(b)(6); *St. Benedict's Dev. Co. v. St. Benedict's Hosp.,* 811 P.2d 194, 196 (Utah 1991); *Colman v. Utah State Land Bd.,* 795 P.2d 622, 624 (Utah 1990); *Lowe v. Sorenson Research Co.,* 779 P.2d 668, 669 (Utah 1989). Whether the motion was properly granted is a question of law that we review for correctness. *St. Benedict's Dev. Co.,* 811 P.2d at 196; *Lowe,* 779 P.2d at 669.

### III

■ Before addressing the substantive issues raised in this case, we discuss briefly our method of analysis. A defamation case such as this requires us to consider several overlapping bodies of law. *See Locricchio v. Evening News Ass'n,* 438 Mich. 84, 476 N.W.2d 112, 125 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992). A visual model for understanding the nature of this overlap might be represented by three interlocking circles. The first circle represents state defamation law and embodies the significant interest states have in providing tort remedies for injuries to reputation. The second circle, impinging on the first to varying degrees depending on language and interpretation, represents state constitutional guarantees of freedom of expression and freedom of the press. The third circle over-

laps both the first and the second and embodies federal free expression and free press guarantees.[4] Thus, state defamation law may not permit causes of action that impair state or federal constitutional freedom of expression or freedom of the press.

With this framework in mind, we begin our analysis by focusing on state common law and statutory principles, in adherence to the general rule that courts should avoid reaching constitutional issues if the case can be decided on other grounds. *See State v. Anderson,* 701 P.2d 1099, 1103 (Utah 1985); *State ex rel. Div. of Consumer Protection v. Rio Vista Oil, Ltd.,* 786 P.2d 1343, 1349 (Utah 1990); *see also Lloyd Corp. v. Whiffen,* 307 Or. 674, 773 P.2d 1294, 1296–97 (1989); *State v. Shack,* 58 N.J. 297, 277 A.2d 369, 371–72 (1971). In other words, courts should decide cases on nonconstitutional grounds where possible, including common law or statutory grounds.[5] As the Pennsylvania Supreme Court stated: "We should be wary of insulating [ ] development[s] against legislative, judicial or private change by enshrining a particular position in the text of the constitution. Social and economic developments require a flexible legal framework which can adapt to them." *Western Pa. Soc. Workers v. Connecticut Gen. Life Ins. Co.,* 512 Pa. 23, 515 A.2d 1331, 1335 (1986). Perhaps equally important, resolving cases on nonconstitutional grounds ensures the continued vitality and growth of the common law and provides guidance on the proper construction of statutes.

If the court cannot resolve the issue before it by reference to common law or statutory law and instead must resort to constitutional law, the question frequently arises whether the court should address the issue under the state constitution, the federal constitution, or both. This is not merely an arcane proce-

---

4. The scope of state constitutional protection for expression may be broader or narrower than the federal, depending on the state constitution's language, history, and interpretation. In any event, state tort law may not impair state constitutional guarantees and is properly confined to constitutionally permissible limits. Thus, we see no legitimate reason to examine First Amendment limitations until a full determination of the per-

missible scope of state defamation law—including state constitutional law—has been completed.

5. *See* Judith S. Kaye, *The Common Law and State Constitutional Law as Full Partners in the Protection of Individual Rights,* 23 Rutgers L.J. 727, 750–52 (1992). Judge Kaye refers to these nonconstitutional grounds as "subconstitutional" bases for a decision. *Id.* at 740.

dural consideration. Decisions by courts that fail to adhere to a consistent method of addressing state and federal constitutional issues are commonly criticized as result-oriented. *See, e.g.,* Earl M. Maltz, *The Political Dynamic of the "New Judicial Federalism",* 1989 Emerging Issues in St. Const.L. 233, 233, 236; Ronald K.L. Collins, *Reliance on State Constitutions: Away from a Reactionary Approach,* 9 Hast. Const.L.Q. 1, 1–3, 9–10 (1981); Christine M. Durham, *Employing the Utah Constitution in the Utah Courts,* Utah B.J., Nov. 1989, 25, 25–26.[6] A similar criticism has been levelled against this court. *See* Milo S. Marsden, *The Utah Supreme Court and the Utah State Constitution,* 1986

Utah L.Rev. 319, 321 ("Although the Utah Supreme Court actively looks to Utah's constitution, its decisions are uneven. The court has not developed a consistent approach for cases in which both state and federal constitutional claims are made.").

There are at least four models for determining when and under what circumstances courts should base decisions on their own constitutions where there are related or similar federal constitutional provisions. The four are generally described as (i) the "primacy" model, (ii) the "interstitial" model, (iii) the "dual sovereignty" model, and (iv) the "lockstep" model. *See* Durham, *supra,* at 26; Jennifer Friesen, *State Constitutional Law:*

**6.** Another practical reason for adhering to a consistent method of addressing state and federal constitutional issues is the time and expense saved by avoiding multiple trips through state and federal appellate courts. The New York Court of Appeals' decision in *Immuno AG. v. Moor–Jankowski,* 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d 1270, *cert. denied,* —— U.S. ——, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991), is a notable example. In that case, the defendant appealed the trial court's refusal to grant summary judgment on a number of defamation claims arising from a letter to the editor published in a scientific journal. An intermediate appellate court reversed, holding that the statements were protected opinion. *Immuno AG. v. Moor–Jankowski,* 145 A.D.2d 114, 537 N.Y.S.2d 129, 133 (1989). The New York Court of Appeals affirmed that decision. *Immuno AG. v. Moor–Jankowski,* 74 N.Y.2d 548, 549 N.Y.S.2d 938, 941, 549 N.E.2d 129, 132 (1989). Shortly thereafter, the United States Supreme Court decided *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), which significantly altered the landscape of the First Amendment opinion privilege. The Court granted certiorari in the *Immuno AG.* case, vacated the New York Court of Appeals' decision, and remanded the case for reconsideration in light of *Milkovich. Immuno AG. v. Moor–Jankowski,* 497 U.S. 1021, 110 S.Ct. 3266, 111 L.Ed.2d 776 (1990).

On remand, the New York Court of Appeals followed the Supreme Court's directive and analyzed the claims under *Milkovich,* concluding that the statements at issue were protected by the First Amendment. *Immuno AG.,* 566 N.Y.S.2d at 911–13, 567 N.E.2d at 1275–77. The court then engaged in a separate state constitutional analysis and concluded that the statements were *also* protected by the New York Constitution. *Id.* at 913–18, 567 N.E.2d at 1277–82. The majority justified its decision to consider the state constitution for the first time on remand by stating, "In view of the costly, sizable record already amassed, including hundreds of pages of briefs, no purpose is served by compelling *these* parties,

on *this* record and *these* briefs, to consider another trip to Washington...." *Id.* at 914–15, 567 N.E.2d at 1278–79. The majority also stated, "Had the defendant initially presented the issue as one of independent State constitutional law, instead of as an undenominated argument premised on the assumed identity of State and Federal law, it might have been resolved on that basis a year ago." *Id.* at 914, 567 N.E.2d at 1278.

The procedural history of the *Immuno AG.* case demonstrates the need for a consistent and principled method of addressing state and federal constitutional claims. *See also State v. Kennedy,* 295 Or. 260, 666 P.2d 1316, 1320 (1983) (in case with similar procedural history, court noted, "As it is, we reach the issue of Oregon law two and one-half years and hundreds of pages of briefs after it might have been decided in the Oregon courts."); *State v. Hershberger,* 462 N.W.2d 393, 395, 396–97 (Minn.1990) (United States Supreme Court remanded in light of *Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); Minnesota Supreme Court refused to reconsider and decided case under Minnesota Constitution).

These cases also demonstrate that a principled method of addressing state and federal constitutional issues is necessary as a matter of comity toward federal courts. In *Immuno AG.,* Judge Simons wrote a concurring opinion in which he criticized the majority for making a ruling on federal constitutional law and simultaneously insulating it from Supreme Court review by engaging in an independent state constitutional analysis. 566 N.Y.S.2d at 919, 567 N.E.2d at 1283 (Simons, J., concurring). The Vermont Supreme Court cautioned *against* engaging in a state constitutional analysis following remand from the Supreme Court, stating, "[There is] potential for great friction between the state and federal judiciaries, and concomitant damage to the authority, efficiency, and finality of the United States Supreme Court." *State v. Badger,* 141 Vt. 430, 450 A.2d 336, 347 (1982).

*Litigating Individual Rights, Claims and Defenses* ¶ 1.04 (1993). According to the primacy approach, "a state court looks first to state constitutional law, develops independent doctrine and precedent, and decides federal questions only when state law is not dispositive." Durham, *supra*, at 26; *see* Friesen, *supra*, ¶ 1.06[1]. The interstitial approach establishes a presumption that federal law is controlling and reaches state constitutional issues only when the case cannot be resolved by reference to federal law. Durham, *supra*, at 26; Friesen, *supra*, ¶ 1.06[3].[7] Courts employing a dual sovereignty approach analyze both federal and state grounds for the decision, even where the case can be resolved on federal grounds alone. Friesen, *supra*, ¶ 1.04[4]. The lockstep approach does not allow independent interpretation of a state constitution, effectively ceding interpretative authority for the state's constitution to the United States Supreme Court. Durham, *supra*, at 26–27; Friesen, *supra*, ¶ 1.06[2].[8]

In the present context, we are persuaded that the primacy model is the best method to address the interests at stake. As a matter of logic,

> [t]he proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim. This is required, not for the sake either of parochialism or of style, but be-

cause the state does not deny any right claimed under the federal Constitution when the claim before the court in fact is fully met by state law.

*Sterling v. Cupp*, 290 Or. 611, 625 P.2d 123, 126 (1981); *see also* Hans A. Linde, *E Pluribus—Constitutional Theory and State Courts*, 18 Ga.L.Rev. 165, 178 (1984) ("My own view has long been that a state court always is responsible for the law of its state before deciding whether the state falls short of a national standard, so that no federal issue is properly reached when the state's law protects the claimed right."); Hans A. Linde, *First Things First: Rediscovering the States' Bills of Rights*, 9 U.Balt.L.Rev. 379, 383 (1980) ("Just as rights under the state constitutions were first in time, they are first also in the logic of constitutional law.").

By looking first to state constitutional principles, we also act in accordance with the original purpose of the federal system. *Id.* at 383–84; Friesen, *supra*, ¶ 1.03[1]. Prior to the incorporation of the Bill of Rights, state constitutions were the only source of protection for individual rights and have continued as important sources of such rights ever since. Further, a growing number of courts have recognized both the utility and the legitimacy of fully exhausting state law before resorting to the federal constitution and accordingly have adopted the primacy model.[9] The primacy model has also been

---

**7.** In *State v. Hunt*, 91 N.J. 338, 450 A.2d 952 (1982), the New Jersey Supreme Court, a proponent of the interstitial approach, articulated seven criteria that it concluded would justify a result different from that reached under federal law: (i) textual differences in the federal and state constitutional provisions, (ii) "legislative history" of state provision indicating that it should be interpreted differently, (iii) state law predating United States Supreme Court decisions, (iv) structural differences between the state and federal constitutions, (v) a subject matter of peculiar state interest, (vi) particular state history or traditions, and (vii) public attitudes in the state. 450 A.2d at 965–67.

**8.** In recent years, there has been a dramatic increase in scholarly commentary on state constitutional law. An exhaustive bibliography of such commentary may be found in Jennifer Friesen, *State Constitutional Law: Litigating Individual Rights, Claims and Defenses* (1993).

**9.** *See, e.g., Large v. Superior Court*, 148 Ariz. 229, 714 P.2d 399, 405 (1986) ("In construing the Arizona Constitution we refer to federal constitutional law only as the benchmark of minimum constitutional protection."); *Traylor v. State*, 596 So.2d 957, 961 (Fla.1992) ("Consistent with the federalist principles set forth below, we examine the confessions initially under our state Constitution; only if they pass muster here need we reexamine them under federal law."); *State v. Perry*, 610 So.2d 746, 750 (La.1992) ("Greater judicial efficiency and coherence are promoted when we address state [constitutional] law issues first."); *City of Portland v. Jacobsky*, 496 A.2d 646, 648 (Me.1985) ("Just as we avoid expressing opinions on constitutional questions when the issue before us on appeal may be otherwise resolved, a similar policy of judicial restraint impels us to forbear from ruling on federal constitutional questions when the provisions of our state may settle the matter."); *State v. Johnson*, 221 Mont. 503, 719 P.2d 1248, 1255 (1986) (" '[A] state court always is responsible for the law of its

advocated by at least one justice of the United States Supreme Court. *See Delaware v. Van Arsdall,* 475 U.S. 673, 705, 106 S.Ct. 1431, 1448, 89 L.Ed.2d 674 (1986) (Stevens, J., dissenting).[10]

Finally, defamation is an area particularly well suited to the primacy approach and to resolution as a matter of state law. *See Immuno AG. v. Moor–Jankowski,* 77 N.Y.2d 235, 566 N.Y.S.2d 906, 913, 567 N.E.2d 1270, 1277 *cert. denied,* —— U.S. ——, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991). The First Amendment creates a broad, uniform "floor" or minimum level of protection that state law must respect. Above this floor, states may balance the need to redress injuries to reputation with guarantees of free expression in a distinct way, thereby accounting for the unique history, needs, and experiences of their residents. Using the primacy model in the context of defamation actions will require state courts to fully explicate the contours and constitutional boundaries of state law before examining claims that state law violates First Amendment guarantees.

Because defamation law is an area uniquely suited to resolution on state law grounds and because the primacy model represents the most efficient means of resolving these cases, we adopt it in this context.[11] Accordingly, we shall address whether the statements at issue in this case are actionable by first looking for a resolution under state common law and statutory law and then the Utah Constitution. If the case cannot be resolved under state law, we will then proceed to the United States Constitution and First Amendment principles.

### IV

■ The first issue we must resolve is whether, given the undisputed facts, West can state a claim for defamation. To state a claim for defamation, he must show that defendants published the statements concerning him,[12] that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the

state before deciding whether the state falls short of a national standard, so that no federal issue is properly reached when the state's law protects the claimed right.' " (quoting Hans A. Linde, *E Pluribus—Constitutional Theory and State Courts,* 18 Ga.L.Rev. 165, 178 (1984))); *Kennedy,* 666 P.2d at 1318 ("The history of this case demonstrates the practical importance of the rule, often repeated in recent decisions, that all questions of state law be considered and disposed of before reaching a claim that this state's law falls short of a standard imposed by the federal constitution on all states."); *State v. Chaisson,* 125 N.H. 810, 486 A.2d 297, 301 (1984) ("We, of course, address the State constitutional issues first."); *Davenport v. Garcia,* 834 S.W.2d 4, 17 (Tex.1992) ("Basing decisions on the state constitution whenever possible avoids unnecessary federal review. This not only lessens federal interference into state issues, but also results in 'efficient judicial management.' " (footnote omitted)); *State v. Coe,* 101 Wash.2d 364, 679 P.2d 353, 359 (1984) ("Whether the prior restraint was constitutionally valid or invalid should be treated first under our state constitution. . . ."). *See generally* Friesen, *supra* note 8, ¶ 1.05[1].

Some of this court's decisions have suggested the appropriateness of the primacy approach. *See, e.g., State v. Ramirez,* 817 P.2d 774, 784 (Utah 1991) ("[B]ecause we have found article I, section 7 satisfied, we see no need to perform a separate . . . federal analysis."); *Amax Magnesium Corp. v. State Tax Comm'n,* 796 P.2d 1256, 1261 (Utah 1990) ("[I]f the challenged statute cannot withstand attack under the state constitution, there is no reason to reach the federal question."); *Malan v. Lewis,* 693 P.2d 661, 675 (Utah 1984) (finding guest statute unconstitutional under article I, section 24 of the Utah Constitution).

**10.** According to Justice Stevens, "The emerging preference for state constitutional bases of decision in lieu of federal ones is, in my view, the analytical approach best suited to facilitating the independent role of state constitutions and state courts in our federal system." *Delaware v. Van Arsdall,* 475 U.S. 673, 705, 106 S.Ct. 1431, 1448, 89 L.Ed.2d 674 (1986) (Stevens, J., dissenting).

**11.** Our adoption of the primacy approach in the defamation context does not necessarily preclude another approach in a context that is less suited for primacy analysis.

**12.** The term "defamation" encompasses both libel and slander. The primary distinction between libel and slander is the nature of the publication. Libel is defamation expressed by "printing, or by signs or pictures or the like . . ." Utah Code Ann. § 45–2–2(1). Slander, on the other hand, is defamation "by spoken words." Utah Code Ann. § 45–2–2(2). *See generally* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 112 (1984) [hereinafter Prosser & Keeton]; Restatement (Second) of Torts § 568 (1972); Rodney A. Smolla, *Law of Defamation* § 1.04[1] (1994).

requisite degree of fault,[13] and that their publication resulted in damage. *See Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988); *Seegmiller v. KSL, Inc.*, 626 P.2d 968, 974, 976 (Utah 1981); *Berry v. Moench*, 8 Utah 2d 191, 331 P.2d 814, 818–19, 820–21 (1958); Utah Code Ann. §§ 45–2–2, –7; *see also* Restatement (Second) of Torts § 558 (1972). In the present case, it is undisputed that defendants published the statements and that they concerned West. We must accept as true West's allegations that the statements are false and that their publication resulted in damage. Thus, the threshold issues are whether the statements are capable of sustaining a defamatory meaning and whether any qualified or absolute privileges preclude West's claim.

■ Whether a statement is capable of sustaining a defamatory meaning is a question of law, and we review the lower court's rulings for correctness. *Cox*, 761 P.2d at 561; *see also Wecht v. PG Publishing Co.*, 353 Pa.Super. 493, 510 A.2d 769, 771 (1986); Restatement (Second) of Torts § 614 (1972); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 111, at 774 (1984) [hereinafter Prosser & Keeton]; Rodney A. Smolla, *Law of Defamation* § 4.08 (1994). If the court determines that the statement is capable of sustaining such a meaning as a matter of law, the trier of fact must then determine whether the statement was in fact so understood by its audience. *See Cox*, 761 P.2d at 561; Restatement (Second) of Torts § 614 (1972); Smolla, *supra*, § 4.08.

Under Utah law, a statement is defamatory if it impeaches an individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule. *Cox*, 761 P.2d at 561 (citing Utah Code Ann. § 45–2–2(1)).[14] At its core, an action for defamation is intended to protect an individual's interest in maintaining a good reputation. *Id.; Berry*, 331 P.2d at 818; *see also Milkovich v. Lorain Journal*, 497 U.S. 1, 11–13, 110 S.Ct. 2695, 2702, 111 L.Ed.2d 1 (1990). Thus, in determining whether a particular statement fits within the rather broad definition of what may be considered defamatory, the guiding principle is the statement's tendency to injure a reputation in the eyes of its audience. *Cox*, 761 P.2d at 561; Prosser & Keeton, *supra*, § 111, at 773; Smolla, *supra*, § 4.01.

■ The trial court granted defendants' motion to dismiss the claims against Hogun and Goodey arising from the November manipulation statement on the ground that the statement could not sustain a defamatory meaning. The court of appeals reversed. *West v. Thomson Newspapers*, 835 P.2d 179, 190 (Utah Ct.App.), *cert. granted*, 843 P.2d 1042 (Utah 1992). In doing so, the majority consulted a dictionary and reasoned that because one of the several definitions listed for "manipulate" had a negative connotation, the manipulation statement was capable of sustaining a defamatory meaning. *Id.*

■ Defendants claim that in resorting to a dictionary definition and searching for a "possible negative connotation," the court of appeals ignored the context in which the statement was made and failed to fully discharge its obligation to make an initial inquiry into whether the statement was defamato-

---

**13.** Utah's "fault" requirement for public figure plaintiffs such as West is derived from First Amendment standards. *See Seegmiller v. KSL, Inc.*, 626 P.2d 968, 971–72 (Utah 1981). We do not undertake any analysis of its content in this discussion of state law standards.

**14.** Section 45–2–2(1) defines libel as follows:

"Libel" means a malicious defamation, expressed either by printing or by signs or pictures or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation, or publish the natural defects of one who is alive, and thereby to expose him to public hatred, contempt or ridicule.

Utah Code Ann. § 45–2–2(1).

In *Cox v. Hatch*, 761 P.2d 556 (Utah 1988), we stated, "[T]o be defamatory under Utah law, a communication must impeach an individual's honesty, integrity, virtue, or reputation *or* publish his or her natural defects *or* expose him or her to public hatred, contempt, or ridicule." *Id.* at 561 (emphasis added). In this passage, we framed these alternatives in the disjunctive. The language of the statute, however, requires that a libelous expression fit into one of the named categories *"and thereby* to expose him to public hatred, contempt or ridicule." Utah Code Ann. § 45–2–2(1). Thus, the requirement that the expression expose the plaintiff "to public hatred, contempt or ridicule" is an additional requirement rather than an alternative definition of "libel."

ry as a matter of law. We agree. Although a dictionary may define and give some content to allegedly defamatory words, it cannot be dispositive. A court simply cannot determine whether a statement is capable of sustaining a defamatory meaning by viewing individual words in isolation; rather, it must carefully examine the context in which the statement was made, giving the words their most common and accepted meaning. *See Western States Title Ins. Co. v. Warnock*, 18 Utah 2d 70, 415 P.2d 316, 318 (1966); *see also James v. Gannett Co.*, 40 N.Y.2d 415, 386 N.Y.S.2d 871, 875, 353 N.E.2d 834, 838 (1976); Smolla, *supra*, § 4.05[1]. The problem with the lexicographical approach utilized by the court of appeals is that it ignores context.[15] As Justice Holmes explained, "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918).

Viewed contextually, the manipulation statement appears in a newspaper editorial column and involves a prominent local politician engaged in a heated political battle. The column describes West's attempts to encourage the press not to publish stories critical of his actions and instead to publish stories critical of his political opponent. These attempts are summarized in the author's acerbic statement that West has attempted to manipulate the press. While no politician would welcome such criticism—and indeed might find it personally offensive—this does not render it defamatory. "A publication is not defamatory simply because it is nettlesome or embarrassing to a plaintiff, or even because it makes a false statement about the plaintiff." *Cox*, 761 P.2d at 561. West must establish that the statement is more than sharp criticism. *See Ferguson v. Watkins*, 448 So.2d 271, 276 (Miss.1984). He must establish that it damaged his reputation as a politician in the eyes of at least a substantial and respectable minority of its audience.[16] While we agree that the statement is critical of West, we do not believe it rises to the level of defamation.

The manipulation statement appeared in a newspaper editorial, a traditional source of harsh political invective. Newspaper readers expect that statements in editorials will be more exaggerated and polemicized than "hard news." Readers are therefore less likely to form personal animus toward an individual based on statements made in an editorial. Moreover, as West concedes in his letter to the editor, criticism by newspaper

---

15. An additional problem with the court of appeals' approach is that it leads to confusing and irreconcilable results. The meanings that dictionaries attribute to particular words are far from universally consistent. In fact, most dictionaries—including the one relied on by the majority below—list multiple, sometimes conflicting, definitions for a single word. A problem arises when some of those definitions ascribe positive attributes to the word and others negative. "Manipulate" is the epitome of such a problem. The definition of "manipulate" relied on by the majority was " 'to control, manage or play upon by artful, unfair or insidious means especially to one's own advantage.... [m]anagement with the use of unfair, scheming or underhanded methods especially for one's own advantage.' " *West*, 835 P.2d at 190 (quoting *Webster's Third New International Dictionary* 1376 (unabridged 1986)). As the dissent below pointed out, that same dictionary also defines "manipulate" as follows: " 'handle or manage esp. with skill or dexterity,' 'to treat or manage with the mind or intellect,' 'to control the action or course of by management: utilize by controlling and managing.' " *Id.* at 192 (Garff, J., dissenting) (quoting *Webster's Third New International Dictionary* 1376 (unabridged 1986)). The majority attempts to resolve this dilemma by stating that if any of the definitions have a negative connotation, the statement is susceptible of a defamatory meaning and therefore the trier of fact must decide whether the statement was understood as defamatory. *Id.* at 190. While attractive in its simplicity, this approach effectively eviscerates the court's responsibility to determine initially if the statement is defamatory as a matter of law.

16. The relevant audience does not consist solely of the plaintiff. Nor does it require an examination of society at large or a hypothetical reasonable person, as is the case in English law. According to the American approach, the statement must be derogatory in the eyes of a "substantial and respectable minority." Restatement (Second) of Torts § 559 cmt. e (1972). According to the Restatement, "Although defamation is not a question of majority opinion, neither is it a question of the existence of some individual or individuals with views sufficiently peculiar to regard as derogatory what the vast majority of persons regard as innocent." *Id.*

columnists "comes with the job of being mayor." Readers likewise expect to see public officials criticized in editorial writing and are therefore less likely to rely on it in forming their opinions of the official. While statements about public figures in newspaper editorials are not incapable of being defamatory, these factors all tend to negate damage to West's reputation and therefore make it less likely that the statement was defamatory.

The manipulation statement itself was made in a casual, albeit critical, tone. It is unlikely that any reader would take it at face value; instead, most readers would view it as exaggerated commentary expressing Goodey's frustration in dealing with West. Exaggerated commentary such as this is not likely to damage West's reputation. Other courts have found exaggerated editorial commentary not defamatory. In *Wecht v. PG Publishing Co.*, 353 Pa.Super. 493, 510 A.2d 769 (1986), the court found that cartoons and accompanying editorial comments showing a political figure acting in a "coarse, vile, obscene, and abusive manner" and implying that he was "an insensitive, malicious, hypocritical person who takes delight in the misfortune of others" were not defamatory, as "even the most careless reader would understand that the cartoons were no more than a humorous exaggeration of what the cartoonists believed to be [the plaintiff's] undesirable traits." *Id.* 510 A.2d at 773; *see also Miskovsky v. Oklahoma Publishing Co.*, 654 P.2d 587, 593 (Okla.1982) (calling senatorial candidate "hatchet man" is analogous to calling someone "scalawag," "rake," or "scoundrel," none of which are defamatory), *cert. denied*, 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982); *cf. National Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284, 286, 94 S.Ct. 2770, 2781, 2782, 41 L.Ed.2d 745 (1974) (using "traitor" in definition of union "scab" not defamatory because word is used "in a loose, figurative sense" and was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members");

*Greenbelt Coop. Publishing Ass'n v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6 (1970) ("blackmail" not defamatory because "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the plaintiff's] negotiating position extremely unreasonable").[17]

Stripped of exaggeration, the most that can be said of the manipulation statement is that it criticized West for trying to use his political position to influence information disseminated to the public. Such criticism is not defamatory. In *DiBernardo v. Tonawanda Publishing Corp.*, 117 A.D.2d 1009, 499 N.Y.S.2d 553 (1986), the plaintiff sued a local newspaper, claiming that a series of articles falsely stated that he was involved in improper and dishonest conduct while seeking appointment as superintendent of buildings and grounds for the local school district. In upholding summary judgment for defendant, the court stated, "The writings stated either expressly or impliedly that political influence and manipulation were involved in plaintiff's quest for appointment, but absent a clear assertion of criminality, accusations of [using] political influence to obtain a benefit are not defamatory." *Id.* 499 N.Y.S.2d at 554; *see also Arrigoni v. Velella*, 110 A.D.2d 601, 488 N.Y.S.2d 184, 186 (1985) ("In the absence of some clear assertion of criminality, accusations of the use of political influence to gain some benefit from the government are not defamatory...."); *Pace v. Rebore*, 107 A.D.2d 30, 485 N.Y.S.2d 291, 293 (1985) (stating that plaintiffs used "political clout" to obtain tax exemption for their property held not defamatory). As these cases demonstrate, absent assertions of illegal or at least ethically improper conduct, it is not defamatory to criticize a politician for using his or her office for personal gain. That is essentially the criticism defendants leveled against West. There is no allegation that attempting to manipulate the press is crimi-

---

**17.** We reference *National Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), and *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), and the concept of "rhetorical hyperbole" only by analogy to support our independent conclusion that exaggerated editorial commentary of the type involved in the present case could not have damaged West's reputation and is therefore not defamatory. We do not rely on this federal precedent in reaching our conclusion.

nal or even ethically improper conduct. This, combined with the general context in which the statement appears, convinces us that the manipulation statement could not have damaged West's reputation. Accordingly, even though the criticism may have embarrassed or annoyed him and even though it may have been false, it cannot be said that it exposed him to public hatred, contempt, or ridicule. The manipulation statement, read in context, is not defamatory as a matter of law.

Context is also important to a proper construction of the June and July change-of-position statements, but for a slightly different reason. West does not claim that the change-of-position statements are defamatory on their face. On their face, the columns simply stated that West was opposed to municipal power before the election and supported it afterward. Citizens expect that responsible public officials will occasionally change their views for a variety of legitimate reasons. Stating that a politician has done so is not enough, by itself, to sustain a defamatory meaning. Instead, West claims that because the municipal power issue was vitally important to the community and because many voters based their vote for mayor on this single issue, the statement implies that he purposely misled voters to get elected. Thus, it is the implication arising from

the statement and the context in which it was made, not the statement itself, which forms the basis of West's claim.[18] Accordingly, this is a defamation-by-implication claim. *See Locricchio v. Evening News Ass'n*, 438 Mich. 84, 476 N.W.2d 112, 129–34 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992).

The trial court ruled that the implication was capable of sustaining a defamatory meaning. That court stated, "[A] candidate who would espouse opposition to municipal power to get elected and then immediately pursue a pro-municipal power agenda as Mayor of the city would be viewed as a liar and the worst kind of political cheat." The court of appeals agreed that the implication, i.e., that West misled voters to get elected, was capable of sustaining a defamatory meaning. *West*, 835 P.2d at 186.[19] Defendants have not appealed that ruling, and we sustain it on that basis.

 Having accepted that the implication arising from the change-of-position statements is defamatory, we must now consider whether that implication is subject to any common law or statutory privileges. The only privilege advanced in this case is the common law fair comment privilege. *See Williams v. Standard–Examiner Publishing*

18. As one commentator explains:

> Words that appear at first blush to convey a defamatory meaning may be explained away as innocuous when their context is made clear. Conversely, words innocent on their face may, when explained in context, convey a defamatory meaning. The classic example is the statement that John Smith was seen walking into a hotel room with Mary. On its face, the statement *does not communicate anything intend*ing to injure reputation. If, however, there is added to the statement the fact that John Smith is married to someone other than Mary, the inference that the ordinary reasonable recipient may draw—that John is involved in an adulterous relationship with Mary—becomes defamatory.

Smolla, *supra* note 12, § 4.05[1], at 4–18 (citations omitted).

19. Neither the trial court nor the court of appeals clearly articulated the distinction between statements that are defamatory on their face and those that are defamatory by implication. Both courts, however, were obviously concerned with the implication arising from the change-of-posi-

tion statement, rather than with the statement itself. In finding the implication defamatory, the trial court reviewed the political context in which the statement was made and then stated, "Under *those circumstances*, it is clear that a candidate who would espouse opposition to municipal power to get elected and then immediately pursue a pro-municipal power agenda as Mayor of the city would be viewed as a liar and the worst kind of political cheat." The court of appeals was likewise concerned with the implication arising from the change-of-position statement. In discussing the applicability of the opinion privilege, the court stated that it must "determine whether the connotation that West opposed municipal power in order to be elected was sufficiently factual to be susceptible of being proven false." *West*, 835 P.2d at 186.

The dissent below also focused on the implication that arose from the change-of-position statement. According to the dissent, the statements are not defamatory on their face and they "do not directly imply West intended to deceive voters, nor do they imply he lied about his prior position." *Id.* at 192 (Garff, J., dissenting).

*Co.*, 83 Utah. 31, 27 P.2d 1, 13–16 (1933).[20] Whether a statement is protected by the fair comment privilege is a question of law to be decided by the court. *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 58 (Utah 1991).

For the fair comment privilege to apply, the allegedly defamatory statement must be an opinion based upon true or privileged assertions of fact. *See Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 902 (Utah 1992); *Ogden Bus Lines v. KSL, Inc.*, 551 P.2d 222, 224–25 (Utah 1976); *Williams*, 27 P.2d at 15–16.[21] In the June and July columns, defendants stated that West opposed municipal power prior to the election and supported it afterward. Although not defamatory in and of itself, this factual assertion serves as a foundation for the allegedly defamatory implication that West deceived voters by adopting a politically popular view to get elected. Thus, for the fair comment privilege to apply, the statement in the June and July columns that West changed his position on municipal power must be either true or privileged. West claims that he has always supported municipal power and therefore never changed his position on the issue. Because of the procedural posture of this case, we must accept West's assertion that

the June and July statements are false. Defendants do not claim any privilege for the factual assertion that West changed his position on municipal power. On this basis, the common law fair comment privilege does not apply to the allegedly defamatory implication arising from the change-of-position statement and West's common law cause of action survives.

V

We next consider whether the implication arising from the change-of-position statements is protected by our state's constitution.[22] Article I, section 15 of the Utah Constitution provides in part, "No law shall be passed to abridge or restrain the freedom of speech or of the press."[23] Most of our decisions construing this provision have arisen in the context of the media's right of access to public records and meetings. *See, e.g., State v. Archuleta*, 857 P.2d 234, 239–40 (Utah 1993); *Society of Professional Journalists v. Bullock*, 743 P.2d 1166, 1177 (Utah 1987); *Kearns–Tribune Corp. v. Lewis*, 685 P.2d 515, 521–24 (Utah 1984); *KUTV, Inc. v. Wilkinson*, 686 P.2d 456, 461–62 (Utah 1984); *KUTV, Inc. v. Conder*, 668

---

**20.** We recently reaffirmed our adherence to the fair comment privilege as a matter of our state's common law. *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 903 n. 19 (Utah 1992).

**21.** The history of the common law fair comment privilege is discussed more fully in part V, *infra*.

**22.** The court of appeals refused to address the state constitutional issue on the ground that it had not been raised before the trial court. *West*, 835 P.2d at 184 n. 5. This conclusion is incorrect as a matter of fact and law. Defendants raised the state constitution as an affirmative defense. During oral argument on defendants' motion for summary judgment, defendants counsel argued that article I, section 15 protected the statements in question. When West requested that the trial court reconsider its ruling in light of *Milkovich*, defendants responded by claiming, inter alia, that reconsideration was unnecessary because the statements were independently protected by state law. Additionally, the state constitutional issue was fully briefed before both this court and the court of appeals. On this basis, we hold that the state constitutional issue was properly raised. *See Northcutt v. Sun Valley Co.*, 117 Idaho 351, 787 P.2d 1159, 1164 (1990). Even if defendants had not raised the issue in the trial

court, we could nonetheless consider it on appeal. As we stated in *Cox*, "Our long-standing rule is that this Court may affirm a judgment of a lower court on a ground other than that relied on by that court." 761 P.2d at 561; *see also Higgins v. Salt Lake County*, 855 P.2d 231, 241 (Utah 1993); *Hill v. Seattle First Nat'l Bank*, 827 P.2d 241, 246 (Utah 1992). In *Cox*, the trial court dismissed the plaintiffs' defamation claim on First Amendment grounds. 761 P.2d at 558. We affirmed that decision on the ground that the complaint failed to state a claim for defamation. *Id.* at 561–62. The trial court in this case similarly dismissed West's claim on First Amendment grounds. We may likewise affirm that ruling on state constitutional grounds.

**23.** The full text of article I, section 15 reads:

No law shall be passed to abridge or restrain the freedom of speech or of the press. In all criminal prosecutions for libel the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

Utah Const. art. I, § 15.

P.2d 513, 518–26 (Utah 1983); *Redding v. Jacobsen*, 638 P.2d 503, 506–09 (Utah 1981); *Redding v. Brady*, 606 P.2d 1193, 1196–97 (Utah 1980). Defendants and amicus argue that the Utah Constitution's free press provisions protect expressions of opinion from defamation actions. This is a question of first impression.

We will begin our analysis by examining the historical background against which article I of the Utah Constitution was drafted. *See Society of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 921 (1993). We will then review the text of article I, section 15 and other relevant constitutional provisions in light of that historical backdrop. In doing so, we conclude that the Utah Constitution provides an independent source of protection for expressions of opinion and note that our conclusion is supported by decisions of sibling states construing similar constitutional provisions.

■ In reviewing the history of article I, we look for guidance to the common law, our state's particular journalistic and editorial traditions, and the intent of our constitution's drafters. Protection of opinion, even if defamatory, has strong roots in the common law.[24] The fair comment privilege developed because common law courts recognized early on that actions for defamation could frustrate the valuable discourse fostered by the free flow of evaluative ideas. Smolla, *supra*, § 6.02[1]. In its earliest form, the privilege provided rather limited protection for expressions of opinion. Over time, however, fair comment was deemed to protect expressions of opinion about the conduct of public officials and political candidates regardless of the reasonableness of the opinion. *Id.* As one commentator observed, "[I]t must be conceded that fair comment sometimes enables journalists and others to escape liability for defamatory language which offends the

taste and moral sense of a substantial part of the community. This occasional abuse is part of the price of free speech...." Note, *Fair Comment*, 62 Harv.L.Rev. 1207, 1216 (1949).

Utah acknowledged this common law privilege as early as 1933. *See Williams v. Standard–Examiner Publishing Co.*, 83 Utah 31, 27 P.2d 1, 13–16 (Utah 1933). In Utah, fair comment came to provide a qualified privilege for a statement if "it involves a matter of public concern, is based on true or privileged facts, and represents the actual opinion of the speaker, but is not made for the sole purpose of causing harm." *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 902 (Utah 1992). As we stated in *Russell*, "[T]he privilege applies only to an expression of opinion, not to a false statement of fact, whether it is expressly stated or implied from an expression of opinion." *Id.* Thus, the common law recognized a clear dichotomy between actionable assertions of fact and nonactionable expressions of opinion.

The journalistic traditions and editorial practices prevailing in Utah during the period of the constitution's drafting also provide helpful insight into the proper construction of article I, section 15 and other constitutional provisions guaranteeing freedom of expression. Utah's history is characterized not only by a proliferation of newspapers,[25] but also by heated editorial exchange. This exchange is best reflected in the rivalry between the *Deseret News*, which was first published in 1850 and represented Mormon church interests, and the *Mormon Tribune* (later called *The Salt Lake Tribune*), which began in 1870 and came to represent non-Mormons in the state. Beginning in 1873, *The Salt Lake Tribune* "pulled off the editorial gloves" and began an all-out assault against the *Deseret News* and Mormon church leaders. During this time, "objectivi-

---

**24.** When construing a constitutional provision, a court may consult common law principles. *See, e.g., American Fork City v. Crosgrove*, 701 P.2d 1069, 1073 (Utah 1985); *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 566 N.Y.S.2d 906, 914, 567 N.E.2d 1270, 1278, *cert. denied*, —— U.S. ——, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991).

**25.** At the turn of the century, more than 580 newspapers were published in Utah, with more than 1,200 editors and publishers. J. Cecil Alter, *Early Utah Journalism: A Half Century of Forensic Warfare Waged by the West's Most Militant Press* 13–15 (1938). The newspapers and their editors represented a broad spectrum of social, political, and economic interests. *Id.* at 387, 389–90.

ty was a vice not to be tolerated in news columns, editorials or correspondence from readers. The news columns and correspondence were frequently more opinionated than the editorials, possibly because the reporters and correspondents were more opinionated than the editorial writers." O.N. Malmquist, *The First 100 Years: A History of The Salt Lake Tribune 1871–1971* 41 (1971). *The Salt Lake Tribune*'s editorial policies were not unique: "During this period of uninhibited journalistic expression; of studied insult; of subtle and coarse humor; of venomous denunciation; and all-around bad manners, *The Tribune* was 'taking it' as well as 'passing it out.'" *Id.* at 42.[26] Thus, at the same time Utah was struggling to gain statehood and to draft its constitution, newspapers in the state—particularly *The Salt Lake Tribune* and the *Deseret News*—were characterized by virulent exchanges on the editorial pages. These exchanges undoubtedly were familiar to the drafters of Utah's free-press provisions.

We glean some additional insight from the rather limited proceedings of the constitutional convention. *See P.I.E. Employees Fed. Credit Union v. Bass*, 759 P.2d 1144, 1146 (Utah 1988). The debate surrounding article I, section 15 focused on the second sentence, which provides a defense in criminal libel prosecutions if the statement is true and was printed "with good motives, and for justifiable ends." Utah Const. art. I, § 15. A delegate to the convention proposed that this provision also apply to civil actions for libel. 1 *Official Report of the Proceedings and Debates of the Utah Constitutional Convention* 320 (Salt Lake City, Star Printing Co. 1898). Another delegate pointed out that libel law permitted a defense based solely on truth and did not require that the statement be published for good motives or a justifiable end. *Id.* In perhaps the most telling remark, a third delegate opposed the amendment because "it is rather an infringement upon the liberties of the press that ought not to exist." *Id.* at 321. A similar amendment was proposed later and ultimately rejected.

*Id.* at 323. This exchange reflects the positive attitude of the constitution's drafters toward a free and uninhibited press.

Against this historical backdrop, we now examine the text of article I, section 15 and other provisions dealing with freedom of expression. Article I, section 15 provides, "No law shall be passed to abridge or restrain the freedom of speech or of the press." Utah Const. art. 1, § 15. By its terms, this provision limits the availability of a defamation action where maintaining it would "abridge or restrain" a free press. The issue then is whether allowing a defamation action based on an expression of opinion would "abridge or restrain" the press.

Most newspapers, including *The Daily Spectrum*, have verification and review procedures that must be followed prior to publishing a story. The purpose of these procedures is to ensure that published stories are as accurate and complete as possible. If a publication negligently or maliciously fails to follow such procedures with respect to a factual assertion and thereby potentially subjects itself to an action for defamation, one can hardly argue that permitting such an action abridges or restrains the press. On the contrary, such a result encourages responsible journalism.

Expressions of opinion, however, are fundamentally different. Opinions are inherently incapable of verification; they embody ideas, not facts. Editorial review, no matter how stringent, cannot ensure that an opinion will not harm the recipient's reputation. More importantly, expressions of opinion are the mainstay of vigorous public debate. Without opinion, such debate is virtually nonexistent. *See* Note, *supra*, at 1213. Thus, if expressions of opinion could serve as the basis for defamation actions, the press would be forced to choose between publishing opinions knowing that no amount of editorial oversight could protect it from exposure to civil liability or ceasing altogether to publish expressions of opinion. Given the importance of opinion in the marketplace of ideas,

---

**26.** According to one commentator, "No newspapers of any section of the country, or of any period in the Nation's history, were ever more eagerly awaited or more closely read than those hailing from Utah through the anti-polygamy crusade of the last half of the Nineteenth Century." Alter, *supra* note 25, at 9.

either alternative would constitute significant abridgement or restraint of the press.

When construing provisions of our constitution, we must read the document as a whole, giving effect to all provisions. *See City & County of San Francisco v. Farrell,* 32 Cal.3d 47, 184 Cal.Rptr. 713, 716, 648 P.2d 935, 938 (1982); *In re Interrogatories of United States Dist. Court,* 642 P.2d 496, 497 (Colo.1982); *cf. Schurtz v. BMW of N. Am., Inc.,* 814 P.2d 1108, 1112 (Utah 1991) (statutory provisions should be interpreted to give all terms their full effect). Thus, article I, section 15 must be read in conjunction with other constitutional provisions concerning the press. The opening provision of the Utah Constitution provides, "All men have the inherent and inalienable right ... to communicate freely their thoughts and opinions, being responsible for the abuse of that right." Utah Const. art. I, § 1. On its face, this provides a constitutional right to express one's opinion, limited only by the responsibility for "abuse" of that right. The latter phrase is fairly common in state constitutions, and some historical evidence suggests that it was intended to preserve liability for defamation. *See* Friesen, *supra,* ¶ 5.02[e]. However, as indicated above, article I, section 15 circumscribes the reach of state defamation law. Accordingly, to the extent the "abuse" phrase in article I, section 1 preserves actions for defamation, such actions are necessarily limited by article I, section 15.

Reading these constitutional provisions together leads to the following conclusions: Because expressions of pure opinion fuel the marketplace of ideas and because such expressions are incapable of being verified, they cannot serve as the basis for defamation liability. As evidenced by the present case, however, opinions rarely stand alone, isolated from any factual moorings. To convince readers of the legitimacy of an opinion, authors typically describe the perceived factual bases for opinions, seeking to demonstrate that the author's opinions are grounded in common sense. Assertions of fact, being objectively verifiable and much more capable of harming reputation, are not entitled to the same degree of protection afforded expressions of opinion. Thus, article I, sections 1 and 15 protect expressions of opinion, and this protection is "abused" when the opinion states or implies facts that are false and defamatory. If the opinion does not state or imply such facts or if the underlying facts are not defamatory, an action for defamation is improper.[27]

27. In this respect, the protections afforded by the Utah Constitution differ from the common law fair comment privilege. Fair comment *only* protects an opinion that is based upon true or privileged facts. *See Russell,* 842 P.2d at 902; *Ogden Bus Lines v. KSL, Inc.,* 551 P.2d 222, 224–25 (Utah 1976); *Williams v. Standard–Examiner Publishing Co.,* 83 Utah 31, 27 P.2d 1, 15–16 (1933); *see also* Restatement (Second) of Torts § 566 cmt. b (1972). Where a plaintiff such as West claims that the underlying factual assertions are false and those facts are not subject to any privilege, fair comment is rendered inapplicable until a fact finder determines the veracity of those underlying statements. This holds true even if the underlying facts themselves are not defamatory. Defendants in this situation may avail themselves of the fair comment privilege only at trial or on subsequent appeals where a court or jury can make factual determinations. However, both this court and the United States Supreme Court have expressed a preference for pretrial resolution of defamation actions "when it appears that a reasonable jury could not find for the plaintiffs." *Cox,* 761 P.2d at 561 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). Summary procedures are "essential" when the case involves a public figure plaintiff and a media defendant, thereby implicating constitutional values of freedom of expression and freedom of the press. *Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C.Cir.1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). In this context, the prospect of expensive and protracted litigation inevitably will cause the media to avoid controversial speech. *See Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 52–53, 91 S.Ct. 1811, 1824, 29 L.Ed.2d 296 (1971) (plurality opinion); *Time Inc. v. Hill,* 385 U.S. 374, 389, 87 S.Ct. 534, 542, 17 L.Ed.2d 456 (1967); *Thompson v. Evening Star Newspaper Co.,* 394 F.2d 774, 776 (D.C.Cir.), *cert. denied,* 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968); *Immuno AG.,* 566 N.Y.S.2d at 918, 567 N.E.2d at 1282; *Good Gov't Group of Seal Beach, Inc. v. Superior Court,* 22 Cal.3d 672, 150 Cal. Rptr. 258, 263, 586 P.2d 572, 578 (1978), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). *See generally* Scott M. Matheson, Jr., *Procedure in Public Person Defamation Cases: The Impact of the First Amendment,* 66 Tex. L.Rev. 215, 239 (1987) ("[T]he libel chill today arguably comes more from legal fees than from jury verdicts for plaintiffs that survive appellate

Our conclusion that expressions of opinion are protected by the Utah Constitution is supported by decisions of·courts of sibling states construing similar constitutional provisions. During the constitutional convention, Delegate Heber M. Wells stated that article I, section 15, "just as it stands here, is the same as in New York, California, Michigan, Wisconsin, South Carolina, and Maine, and there are similar provisions in a great many of the states." 1 *Official Report of the Proceedings and Debates of the Utah Constitutional Convention* 322 (Salt Lake City, Star Printing Co. 1898); *see Conder,* 668 P.2d at 518–19. In *Conder,* we pointed out that this list is not entirely accurate—Maine and South Carolina did not in fact have similar provisions. *Conder,* 668 P.2d at 519 n. 2.[28] The four remaining states have provisions identical to Utah's, and we have previously noted that decisions by courts in those states may provide useful guidance on the meaning of article I, section 15. *Id.* at 518–19.

In *Immuno AG. v. Moor–Jankowski,* 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d 1270, *cert. denied,* —— U.S. ——, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991), the New York Court of Appeals held that expressions of opinion are protected by article I, section 8 of the New York Constitution. *Id.* 566 N.Y.S.2d at 915–18, 567 N.E.2d at 1279–82.[29] In finding an opinion privilege, the *Immuno AG.* court recognized that state courts have a responsibility to resolve matters concerning freedom of the press under state law. According to the court,

> It has long been recognized that matters of free expression in books, movies and the arts generally, are particularly suited to resolution as a matter of State common law and State constitutional law, the Supreme Court under the Federal Constitution fixing only the minimum standards applicable throughout the nation, and the State courts supplementing those standards to meet local needs and expectations.

*Id.* 566 N.Y.S.2d at 913, 567 N.E.2d at 1277. The *Immuno AG.* court also drew heavily on New York's rich history of journalistic license. *Id.* 566 N.Y.S.2d at 913, 914, 567 N.E.2d at 1277, 1278. This history, combined with the text of New York's constitution, persuaded the court that it should exercise " 'particular vigilance ... in safeguarding the free press.' " *Id.* at 913, 567 N.E.2d at 1277 (quoting *O'Neill v. Oakgrove Constr., Inc.,* 71 N.Y.2d 521, 528 N.Y.S.2d 1, 5, 523 N.E.2d 277, 281 (1988)). Significantly, the court pointed to New York common law as informing its state constitutional analysis. *Id.* 566 N.Y.S.2d at 914, 567 N.E.2d at 1278.[30] The court ultimately held that expressions of opinion could not provide a basis for a defamation action. *Id.* at 916–17, 567 N.E.2d at 1280–81.

The California Supreme Court also has broadly construed the free press provisions

---

review."). Summary procedures afford the press the breathing space necessary to ensure that the prospect of litigating defamation claims will not foster self-censorship. The Utah Constitution furthers this goal by allowing summary procedures where the underlying factual assertions are not defamatory as a matter of law.

28. Mr. Wells was correct that a number of states have similar free press guarantees. In her treatise on state constitutional law, Professor Friesen notes that "state constitutional guarantees of freedom of expression are remarkably similar, which facilitates a sharing of state opinions across state lines." Friesen, *supra* note 8, ¶ 5.02. She cites the language in article I, sections 1 and 15 as "typical" of state free speech guarantees. *Id.* ¶ 5.02[2].

29. Article I, section 8 of the New York Constitution provides:

Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

N.Y. Const. art. I, § 8.

30. In a concurring opinion, Judge Titone argued that the issues raised in that case could˙ be resolved entirely under the common law fair comment privilege. *Immuno AG.,* 566 N.Y.S.2d at 924–25, 567 N.E.2d at 1288–89 (Titone, J., concurring).

of the California Constitution.[31] In *Jacoby v. State Bar*, 19 Cal.3d 359, 138 Cal.Rptr. 77, 562 P.2d 1326 (1977), the court pointed out that its free press guarantee is " 'more definitive and inclusive than the First Amendment.' " *Id.* 138 Cal.Rptr. at 80 n. 2, 562 P.2d at 1329 n. 2 (quoting *Wilson v. Superior Ct.*, 13 Cal.3d 652, 119 Cal.Rptr. 468, 472, 532 P.2d 116, 120 (1975)). The *Jacoby* court cited with approval a court of appeals decision vacating an injunction that stopped publication of campaign material. *Id.* (citing *Wilson*, 119 Cal.Rptr. at 472, 532 P.2d at 120). In *Wilson v. Superior Court*, 13 Cal.3d 652, 119 Cal.Rptr. 468, 472, 532 P.2d 116, 120 (1975), the court relied upon California's history of an unrestrained press and stated that "we have consistently viewed with great solicitude the right to uninhibited comment on public issues." *Id.* 119 Cal.Rptr. at 472, 532 P.2d at 120. The Michigan Supreme Court has also indicated that broad protection for certain types of expression may be available under article I, section 7 of the Michigan Constitution. *See People v. Neumayer*, 405 Mich. 341, 275 N.W.2d 230, 237 (1979).[32]

Thus, three of the four states relied on by the drafters of the Utah Constitution have recognized that their identically worded constitutions provide broad protection for the expression of thoughts and ideas. One of those states, New York, has specifically recognized an opinion privilege. This, combined with the common law distinction between factual assertions and opinions along with Utah's own history of free-wheeling exchanges of editorial opinion, compels the conclusion that the Utah Constitution protects expressions of opinion.

Having concluded that article I, sections 1 and 15 protect expressions of opinion, we must now articulate a method to distinguish actionable fact from nonactionable opinion. Defendants and amicus urge us to adopt a "totality of circumstances" test which takes into consideration the statement as a whole along with the broader context in which the statement is made. *See Immuno AG.*, 566 N.Y.S.2d at 916, 567 N.E.2d at 1280; *Lester v. Powers*, 596 A.2d 65, 71 (Me.1991).

At the outset, we note that distinguishing fact from opinion animated much of the discussion surrounding the common law fair comment privilege. *See* Smolla, *supra*, § 6.02[1]. In fact, the United States Supreme Court's dicta in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), was widely regarded as having "constitutionalized" the fair comment privilege. *See Ollman v. Evans*, 750 F.2d 970, 975 (D.C.Cir.1984) (en banc), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).[33] Thus, it is not surprising that following *Gertz*, federal courts drew heavily on earlier common law decisions to define what was then believed to be a First Amendment opinion privilege. State courts likewise

---

**31.** Article I, section 2 of the California Constitution provides:

Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for abuse of this right. A law may not restrain or abridge liberty of speech or press.

Cal. Const. art. I, § 2. The current version of the California Constitution differs from the version adopted by the California Constitutional Convention in 1849. The two sentences above are roughly the same as the original charter. The original, however, went on to provide:

In all criminal prosecutions on indictments for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted. . . .

1 *Sources and Documents of the United States Constitutions* 448 (William F. Swindler ed., 1974) (citing Cal. Const. of 1849, art. I, § 9).

**32.** Although our research did not reveal any decisions from the Wisconsin Supreme Court concerning this issue, there is at least some indication that article I, section 3 of the Wisconsin Constitution would be similarly construed. *See Jacobs v. Major*, 139 Wis.2d 492, 407 N.W.2d 832, 849–50 (1987) (Abrahamson, J., concurring in part, dissenting in part).

**33.** As the *Ollman* court points out, the dicta in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), that seemed to provide a First Amendment privilege for expressions of opinion did not come out of the blue: "To be sure, pre-*Gertz* straws in the wind suggested that the qualified privilege of fair comment had constitutional dimensions." *Ollman v. Evans*, 750 F.2d 970, 975 n. 7 (D.C.Cir.1984) (en banc) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 292 n. 30, 84 S.Ct. 710, 732 n. 30, 11 L.Ed.2d 686 (1964)), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

turned to the First Amendment to decide cases that would otherwise have been decided on the basis of the fair comment privilege. As it turns out, the decisions were not in fact mandated by the First Amendment. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17–18, 110 S.Ct. 2695, 2705, 111 L.Ed.2d 1 (1985). However, this rich body of case law need not be discarded simply because it purported to be generated by the First Amendment. The decisions were historically and doctrinally rooted in the common law. As such, they provide a useful resource for defining the opinion privilege embodied in the Utah Constitution. They do not, however, compel any specific construction of that provision. We emphasize that to the extent we cite federal authority, we do so only because we consider it persuasive to our independent construction of article I, sections 1 and 15 of the Utah Constitution. *See Michigan v. Long*, 463 U.S. 1032, 1038 n. 4, 103 S.Ct. 3469, 3475 n. 4, 77 L.Ed.2d 1201 (1983).

■ Efforts by federal courts to craft a First Amendment opinion privilege culminated with the Court of Appeals for the District of Columbia's en banc decision in *Ollman*.[34] In *Ollman*, the plaintiff, a Marxist political science professor at New York University, sued nationally syndicated columnists Rowland Evans and Robert Novak for defamation. The lawsuit arose from an Evans and Novak column criticizing a proposal to appoint the plaintiff to chair the Maryland Political Science Department. 750 F.2d at 971–73. In holding the column's statements to be protected opinion, the majority found it "quite impossible to lay down a bright-line or mechanical distinction" between fact and opinion. *Id.* at 977–78. Instead, the court found that the distinction can only be based on the totality of circumstances surrounding the statement. *Id.* at 979. The court articulated the following four factors as useful in distinguishing fact from opinion: (i) the common usage or meaning of the words used; (ii) whether the statement is capable of being objectively verified as true or false; (iii) the

full context of the statement—for example, the entire article or column—in which the defamatory statement is made; and (iv) the broader setting in which the statement appears. *Id.* at 979.

While perhaps not exhaustive, these factors provide a sufficient basis to resolve the issue before us, and we shall address each in turn. Guldan's June and July columns stated, in essence, that West changed his position on municipal power after he was elected mayor of La Verkin. This arguably is a factual assertion. The assertion, however, is not defamatory, and West does not contend otherwise. Instead, West contends that because the municipal power issue was of vital importance to voters, the assertion implies that he misrepresented his true position on municipal power to get elected. Based on the totality of circumstances in which the statements were made, we conclude that any such implication is protected opinion.

Because the allegedly defamatory statements contained in the June and July columns arise by implication, we do not find it particularly useful to examine the meaning of the words used. However, the second factor of *Ollman*'s totality-of-circumstances test— whether the statement is capable of being objectively verified as true or false—provides some guidance. We emphasize that it is the *implication*, not the nondefamatory facts underlying the implication, that is relevant to this inquiry. *See Milkovich*, 497 U.S. at 19–20 & n. 7, 110 S.Ct. at 2706 & n. 7; *Turner v. Devlin*, 174 Ariz. 201, 848 P.2d 286, 289–90, 291 (1993); *Locricchio v. Evening News Ass'n*, 438 Mich. 84, 476 N.W.2d 112, 132–33 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992); *Fleming v. Benzaquin*, 390 Mass. 175, 454 N.E.2d 95, 103–05 (1983); Restatement (Second) of Torts § 566 cmt. b (1972). As the Supreme Court explained in *Milkovich*, "[T]he issue of falsity relates to the *defamatory* facts *implied* by the statement." 497 U.S. at 20 n. 7, 110 S.Ct. at 2706 n. 7 (second emphasis add-

---

**34.** The court's decision in *Ollman* produced seven separate opinions. Judge Starr wrote the majority opinion; Judges Bork, MacKinnon, Robinson, Wald, Edwards, and Scalia all wrote separate opinions. The majority opinion, as well as the concurring opinions of Judges Bork and MacKinnon, endorsed a flexible "totality of circumstances" test for distinguishing fact from opinion. *Ollman*, 750 F.2d at 979, 997, 1016.

ed); *see also id.* at 27–28 & n. 4, 110 S.Ct. at 2710 & n. 4 (Brennan, J., dissenting); *Locricchio*, 476 N.W.2d at 132 ("[T]he questions whether a statement is capable of rendering a defamatory implication and whether, in fact a plaintiff has proved falsity in an implication are separate inquiries.").

In the context of an allegedly defamatory implication, as opposed to an allegedly defamatory statement, the objectively verifiable element essentially breaks down into two questions. *See Milkovich*, 497 U.S. at 20–22, 110 S.Ct. at 2707. First, could a reasonable fact finder conclude that the underlying statement conveys the allegedly defamatory implication? *Id.* Second, if so, is that implication sufficiently factual to be susceptible of being proven true or false? *Id.* In other words, is that implication capable of being objectively verified as true or false?

Applying this analysis to the instant case reveals that the objectively verifiable element argues in favor of finding the implication protected opinion. West claims that because municipal power was such a divisive issue, the statements imply that he misrepresented his position on municipal power to win the election. While we acknowledge that a reasonable fact finder could conclude that the June and July columns conveyed that implication, we do not find the implication sufficiently factual to be susceptible of being proven true or false.

Whether West actually intended to dupe voters into electing him mayor by misrepresenting his position on municipal power is something only West himself knows, not something that is subject to objective verification. *See Ollman*, 750 F.2d at 981–82; *Diez v. Pearson*, 834 S.W.2d 250, 252–53 (Mo.Ct.App.1992); *Hunt v. University of Minn.*, 465 N.W.2d 88, 94 (Minn.Ct.App. 1991). Even if we assume for the sake of argument that West did change his position after being elected mayor, there are a number of entirely legitimate reasons for doing so. For example, he could have simply decided that municipal power was a fiscal imperative. Thus, asking a fact finder to determine the subjective intent behind West's alleged change of position will inevitably produce a verdict based on speculation. "An obvious potential for quashing or muting [free speech] looms large when [fact finders] attempt to assess the truth of a statement that admits of no method of verification." *Ollman*, 750 F.2d at 981–82; *see also Milkovich*, 497 U.S. at 22, 110 S.Ct. at 2707 (" 'Unlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event.' " (quoting *Scott v. News–Herald*, 25 Ohio St.3d 243, 496 N.E.2d 699, 707 (1986))).[35] We will not risk quashing or muting free speech in this manner.

We next examine the context and the broader setting in which the statements were made. The June and July columns were about an elected public official and the political position he took during his election campaign. Suppression of speech in this context is always subject to exacting constitutional scrutiny. *See Kearns–Tribune*, 685 P.2d at 521 ("The freedoms of speech and press are fundamental to the effective exercise of the ultimate political power of the people."). Courts are much more likely to construe statements as opinion when they are made by participants in, and people who comment on, political campaigns. *See, e.g., Ollman*, 750 F.2d at 983; *Miskovsky v. Oklahoma Publishing Co.*, 654 P.2d 587, 590–91 (Okla.), *cert. denied*, 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982); *Wecht v. PG Publishing Co.*, 353 Pa.Super. 493, 510 A.2d 769, 774–75 (1986). West acknowledges this when he admits that by running for mayor he subjected himself to public scrutiny. As Judge Bork explained in *Ollman*:

[The plaintiff], by his own actions, entered a political arena in which heated discourse was to be expected and must be protected.... [He] placed himself in an arena where he should expect to be jostled and bumped in a way that a private person

---

**35.** The present case is similar in some respects to *Milkovich*. Both involve claims that statements in newspaper editorial columns imply defamatory information. In *Milkovich*, however, the alleged implication was that the plaintiff had committed perjury. 497 U.S. at 20–22, 110 S.Ct. at 2707. The Court concluded that the implication that plaintiff had committed a felony was sufficiently factual to be verified as true or false. *Id.* In contrast, the alleged implication that West misled his constituents to get elected is not susceptible to objective verification.

need not expect.... [T]o protect a vigorous marketplace in political ideas and contentions, we ought to accept the proposition that those who place themselves in a political arena must accept a degree of derogation that others need not.

750 F.2d at 1002 (Bork, J., concurring).

In addition, the statements appeared in weekly editorial columns. The author often used these columns to comment on local and national political issues. The columns appeared, as they typically did, on *The Daily Spectrum*'s editorial pages. The presence of Guldan's photograph and byline in both the June and July columns signaled that they were editorial columns as opposed to "hard news." These facts all argue strongly in favor of finding the statements to be protected opinion. As the *Ollman* court explained, "Some types of writing or speech by custom or convention signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." *Id.* at 983. The court continued, "[I]t is well understood that editorial writers and commentators frequently 'resort to the type of caustic bombast traditionally used in editorial writing to stimulate public reaction.'" *Id.* at 984 (quoting *National Rifle Ass'n v. Dayton Newspapers, Inc.*, 555 F.Supp. 1299, 1309 (S.D.Ohio 1983) (finding statement in editorial column that NRA "happily encourages ... murders and robberies" protected opinion)); *see also Milkovich*, 497 U.S. at 32, 110 S.Ct. at 2713 (Brennan, J., dissenting) ("While signed columns may certainly include statements of fact, they are also the 'well recognized home of opinion and comment.'" (quoting *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 227 (2d Cir.1985)); *Loeb v. Globe Newspaper Co.*, 489 F.Supp. 481, 485–86 (D.Mass.1980) (editorial criticism held protected opinion even though it would likely be treated as fact if it appeared on front page); Smolla, *supra*, § 6.12[4][a], at 6–47 to –48 ("On the whole, the decisions run strongly in favor of finding statements on the Op–Ed pages, or in letters to the editor or in political cartoons protected opinion." (footnotes omitted)).[36]

In summary, the fact that the allegedly defamatory implication arising from the change-of-position statements is not verifiable as true or false, combined with the context and broader setting in which the statements were made, compels a conclusion that the alleged implication is protected opinion. The statements involved the political position taken by an elected official during his campaign for office. They appeared in a signed weekly column on *The Daily Spectrum*'s editorial page. The statements are a classic example of political commentary. As such, they represent a category of speech that is entitled to the fullest protection afforded by our state's constitution. By entering the political arena, West exposed himself to pointed, harsh, and even defamatory criticism expressed in the form of opinion. Such expression of opinion must be permitted in the arena of political debate.

## VI

Defendants and amicus have briefed and argued a number of First Amendment issues. They contend that it is incumbent on this court to correct what they view as serious flaws in the court of appeals' actual-malice and opinion-privilege analyses. The court of appeals' decision, they argue, leads to self-censorship by the media by creating uncertainty about the scope of protection for commentary on matters of public controversy. However, in light of our disposition of the issues on state law grounds and our conclusion that article I, sections 1 and 15 protect expressions of opinion such as those at issue in this case, it is unnecessary for us to reach the federal constitutional issues raised by the parties and analyzed by the courts below. *See, e.g., State v. Ramirez*, 817 P.2d 774, 784 (Utah 1991). Having determined that in def-

---

**36.** We decline to adopt a per se rule that would absolutely protect statements made on editorial pages from actions for defamation. The fact that a statement appears on an editorial page is, however, an important factor in assessing the totality of circumstances. As one commentator explains, "Although the editorial format is clearly not determinative, in ambiguous cases the presentation of a statement on an editorial or op-ed page should increase the likelihood that the statement will be perceived as an expression of opinion." Bruce W. Sanford, *Libel and Privacy* 199 (2d ed. Supp.1993).

amation cases all questions of state law—common law, statutory, and constitutional—should be resolved before assessing whether any claimed federal constitutional violations remain, we expressly vacate the opinion of the court of appeals without ruling on the merits of its First Amendment analysis.

The claims against Hogun and Goodey arising from the manipulation statement in the November column are dismissed on the ground that the statement is not capable of sustaining a defamatory meaning. The claims against Guldan, Hogun, and Goodey arising from the change-of-position statements in the June and July columns are dismissed on the basis that they are protected by article I, sections 1 and 15 of the Utah Constitution as expressions of opinion. The claim against Guldan relating to the burglary statement remains before the trial court. Finally, the court of appeals' opinion in *West v. Thomson Newspapers*, 835 P.2d 179 (Utah Ct.App.), *cert. granted*, 843 P.2d 1042 (Utah 1992), is vacated.

ZIMMERMAN, C.J., and STEWART, Associate C.J., concur.

HALL and HOWE, JJ., concur in the result.

HALL, J., acted on this case prior to his retirement.