David K. MAST, Plaintiff and Appellant,

v.

Brent OVERSON, Defendant and Appellee.

No. 971586–CA

Court of Appeals of Utah.

Dec. 31, 1998.

Denver C. Snuffer Jr., Nelson, Snuffer & Dahle, Sandy, for Appellant.

Jay D. Gurmankin and Richard D. Flint, Berman, Gaufin, Tomsic & Savage, Salt Lake City, for Appellee.

Before DAVIS, P.J., and JACKSON and ORME, JJ.

## OPINION

ORME, Judge:

Plaintiff David K. Mast appeals the trial court's grant of summary judgment to defendant Brent Overson. Specifically, Mast argues the trial court erred in concluding that Overson's statements were not defamatory as a matter of law and in not permitting Mast to conduct discovery regarding these statements. We affirm.

## BACKGROUND

In reviewing the trial court's grant of summary judgment, we view all facts and inferences in the light most favorable to the nonmoving party and recite the facts accordingly. *See Hodgson v. Bunzl Utah, Inc.*, 844 P.2d 331, 333 (Utah 1992).

This case arises out of Mast's crusade to stop the South Mountain golf course development in Draper, Utah, which was part of a 250–lot subdivision development. In 1995, the Salt Lake County Parks and Recreation Citizen's Golf Advisory Board reviewed proposals to develop a golf course in the south end of the Salt Lake Valley. They determined that the South Mountain proposal in Draper was the best choice because of its location, design, and cost. The Advisory Board submitted its decision to the Salt Lake County Commission and held public hearings on the proposal. Although the proposal ultimately fell through, it generated a good deal of public interest and debate.

Mast was one of those who was highly interested in the South Mountain proposal. Mast is president of Citizen Taxpayers of Utah (CTU), a nonprofit corporation, and he and CTU have actively opposed various government programs. Typically, this activism includes placing advertisements in local newspapers and bringing actions in court.[1] Regarding the South Mountain golf course, CTU placed advertisements in opposition thereto and, when unhappy with Salt Lake County's response to its request for public records under the Government Records Access and Management Act, Utah Code Ann. §§ 63–2–102 to –909 (1997 & Supp.1998), filed an action against Salt Lake County and Overson, a Salt Lake County Commissioner, to compel complete disclosure.

In opposing the South Mountain course, Mast also spoke with local newspapers. He indicated his difficulties in obtaining records and stated that the County was paying too much for the course and that the County should open the intended construction to competitive bidding. In an August 22, 1996 article, the Deseret News reported that Mast had asked the Utah Attorney General's Office to convene a grand jury to investigate

---

1. For example, CTU has spoken out on a host of local issues with fiscal impacts, including the Utah Transit Authority's budget, the 2002 Winter Olympics, the light rail system, and Salt Palace expansion.

Overson for violating open meetings laws[2] and "fired a volley of other accusations at Overson."

On August 22, 1996, the heated debate culminated in a full page advertisement placed by CTU in the Salt Lake Tribune and Deseret News. CTU's advertisement began with a large bold-faced banner stating, "S.L. COUNTY COMMISSIONER, BRENT OVERSON *MISLEADS* THE PUBLIC AND CONTINUES TO VIOLATE STATE LAW!," under which it proclaimed "BRENT OVERSON HAS HAD MANY *SECRET MEETINGS* WITH SOUTH MOUNTAIN PRIVATE DEVELOPERS ... *BEHIND CLOSED DOORS!*" Under this banner, CTU stated it "WANTS RESIDENTS AND TAXPAYERS TO KNOW ABOUT THE COUNTY'S SCAM CONCERNING THE SOUTH MOUNTAIN GOLF COURSE." CTU stated three more times that Overson "MISLEADS THE PUBLIC," and concluded that "BRENT OVERSON, IN OUR OPINION, HAS VIOLATED STATE LAW BY MEETING MANY TIMES, SECRETLY AND BEHIND CLOSED DOORS WITH SOUTH MOUNTAIN DEVELOPERS. BRENT OVERSON FURTHER DISREGARDS STATE LAW AND REFUSES TO TURN OVER GOVERNMENT RECORDS."

Overson held a press conference that same day where he read the following prepared statement:[3]

Today's full page newspaper ad is politically motivated, mean spirited and a sham. This ad was placed and paid for by David Mast. David Mast is a real estate developer. South Mountain is his competitor. Because I'm the only commissioner facing re-election, I've been singled out by David Mast as a scapegoat for South Mountain. Under the deceptive name of Concerned Taxpayers of Utah, David Mast has attacked my character and integrity. Does David Mast think that this assassination attempt will stop Salt Lake County from buying the South Mountain golf course?

Whether I am here or not, Salt Lake County will still buy and operate this golf course. Why??

1. Salt Lake County's golf master plan calls for a golf course in the southeast area of this valley.

2. The golf advisory board considered three different courses and heartily recommended the South Mountain golf course to fulfill the need identified in the master plan.

3. The Salt Lake County Parks and Recreation Board supports this golf course.

4. It has the support of Draper City.

   and

5. The purchase price is fair and supported by independent analysis.

Isn't it a shame that a public official has to subject himself to threats, personal lawsuits, lies or character assassination? David Mast or whatever you call yourself, I will not shrink from my public duty. The purchase of the South Mountain golf course is the right thing for golf and Salt Lake County.

At the press conference, Overson made other oral comments not contained in his prepared statement, but reported in both the Salt Lake Tribune and the Deseret News. For example, the Deseret News quoted Overson as stating: "This is a competitor who is not happy with this transaction. This 'Concerned Taxpayers of Utah' is a ruse. It's strictly a front for David Mast. It's a wonder anybody runs for public office when they have to be subjected to this kind of harassment." The newspaper also quoted Overson as stating that "[CTU's] ad is rife with misstatements and bare-faced lies." In addition, the Salt Lake Tribune reported that Overson stated that "the county has not held illegal meetings to discuss the golf-course deal."

On August 26, 1996, the following Monday, Overson placed his own full page advertisement carrying a bold-faced banner headline of "THE FACTS" in the Salt Lake Tribune

---

**2.** Palmer Depaulis, spokesperson for the Utah Attorney General's Office, informed Mast that the Attorney General does not convene grand juries.

**3.** At oral argument, Mast's counsel stated that Mast and other CTU members attended the press conference.

and Deseret News. Overson's advertisement, paid for by the Overson Election Committee, responded to CTU's charges, stating that no secret meetings had occurred and explaining there were no irregularities in the South Mountain approval process. The advertisement omitted any reference to either CTU or Mast.

Shortly after this emotionally charged exchange, Mast filed suit against Overson, alleging that Overson had defamed Mast and requesting either damages of at least $1 million or a retraction and apology through full page advertisements in the Salt Lake Tribune and Deseret News and a sixty second commercial on four local television stations. Mast specifically claimed that Overson's August 26 advertisement "contain[ed] false information, with the intention of misleading the public and of discrediting Plaintiff." Mast also generally alleged that, through the media, Overson "published falsehoods about the Plaintiff, . . . accused Plaintiff of being a 'liar,'" and personally attacked Mast by stating that CTU was a "ruse."

Before the parties had conducted any discovery, Overson moved for summary judgment. Mast responded with a motion under Rule 56(f) of the Utah Rules of Civil Procedure, arguing that discovery was necessary to obtain a copy of the video and audio tapes recording the press conference "in which [Overson] made disparaging and false comments about [Mast]." Mast also argued that discovery was necessary to refute the various defenses Overson had raised.[4] Overson objected to Mast's Rule 56(f) motion and also requested a stay of discovery.

After hearing arguments on the various motions before it, the trial court rendered its decision. The court concluded there were no genuine issues of material fact and that Overson was entitled to judgment as a matter of law. Specifically, the court concluded that Overson's statements "would not have injured [Mast's] reputation in the eyes of the audience" and, therefore, were not defamatory. Moreover, the court denied Mast's Rule

56(f) motion, concluding that because Mast failed to meet this threshold determination, further discovery was unnecessary.

## ISSUES AND STANDARDS OF REVIEW

Mast now appeals the trial court's decision arguing, first, that summary judgment was not warranted because Overson's statements were defamatory as a matter of law. A trial court properly grants summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(c). "Because summary judgment is granted as a matter of law, we give the trial court's legal conclusions no particular deference." *Hodgson v. Bunzl Utah, Inc.*, 844 P.2d 331, 333 (Utah 1992).

Second, Mast argues the trial court erred in denying his Rule 56(f) motion and granting summary judgment because deposing Overson would "clarify and elucidate what was stated at the press conference." We review the denial or grant of a Rule 56(f) motion for an abuse of discretion. *See Crossland Sav. v. Hatch*, 877 P.2d 1241, 1243 (Utah 1994). "'Under this standard, we will not reverse unless the decision exceeds the limits of reasonability.'" *Id.* (quoting *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993)).

## DEFAMATION

Initially, we note that this dispute grows out of spirited public debate on an issue of public interest. The First Amendment "'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964) (quoting *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957)). "[E]xpressions of opinion are the mainstay of vigorous public debate" and "fuel the marketplace of ideas." *West v. Thomson Newspapers*, 872 P.2d 999,

---

**4.** Overson's defenses included the following: Overson had absolute executive immunity; Mast's consent gave Overson an absolute privilege; the statements were opinion, protected under the Utah Constitution; the statements were made under a qualified privilege as self-defense, protection of a legitimate interest, or concerning a matter of public interest; Mast was a public figure who failed to show falsity or malice; and Overson was immune from suit.

1014–15 (Utah 1994). "Those who won our independence believed that the final end of the state was to make men free to develop their faculties [and] that public discussion is a political duty." *Whitney v. California,* 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). Although it is clear this particular public debate degenerated to a degree, Mast and Overson were merely continuing the tradition of open exchange necessary to a free society.

■ We first address whether the trial court erred in concluding that Overson's statements were not defamatory as a matter of law. For purposes of our disposition, we assume Overson's statements were completely false. *See Harnicher v. University of Utah Med. Ctr.,* 962 P.2d 67, 69 (Utah 1998) (noting that, on summary judgment, "the court must view the facts in the light most favorable to the non-moving party"). That is, we assume Mast's statements were not lies, much less "bare-faced lies," and that CTU was in no sense a ruse. "[A] statement is defamatory if it impeaches an individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule." *West,* 872 P.2d at 1008. *Accord* Utah Code Ann. § 45–2–2(1) (1993). In deciding whether a statement is capable of sustaining a defamatory meaning, "the guiding principle is the statement's tendency to injure in the eyes of its audience" when viewed in the context in which it was made. *West,* 872 P.2d at 1008–09. The relevant audience is neither an individual with peculiar views, nor a majority of society at large, but rather a " 'substantial and respectable minority.' " *Id.* at 1009 n. 16 (quoting Restatement (Second) of Torts § 559 cmt. e (1972)).

Overson made the statements at his press conference and in his August 26 advertisement in response to CTU's August 22 advertisement. In this context, Overson's statements would not impugn Mast's honesty, integrity, virtue, or reputation in the eyes of the statements' audience. In its August 22 advertisement, CTU listed various reasons why the South Mountain proposal was not in the interests of Salt Lake County citizens, such as the project's foreign financ-

ing, the inadequacy of construction plans, the lack of meaningful public debate, and the plan to subsidize the project with tax dollars. However, CTU also stated the South Mountain proposal was "THE COUNTY'S SCAM" and four times proclaimed that "OVERSON MISLEADS THE PUBLIC." CTU further accused Overson of holding "MANY *SECRET MEETINGS*" and stated that, in its opinion, he had "VIOLATED STATE LAW BY MEETING MANY TIMES, SECRETLY AND BEHIND CLOSED DOORS." Thus, in this advertisement, CTU shifted the debate's focus from the South Mountain proposal's merits to include Overson's allegedly illegal activities.

In *West,* the Utah Supreme Court held that the defendant's statements could not sustain a defamatory meaning given the context in which they were published. *See* 872 P.2d at 1009. The Court reversed this court's holding that "manipulate" could sustain a defamatory meaning because "one of the several [dictionary] definitions . . . had a negative connotation." *Id.* at 1008 (citing *West v. Thomson Newspapers,* 835 P.2d 179, 190 (Utah Ct.App.1992)). The Court observed that in the statement's context—appearing in an editorial column and involving a politician engaged in a political battle—the audience was "less likely to form personal animus toward an individual." *Id.* at 1009. Moreover, because audience members expect criticism in that context, they are "less likely to rely on it in forming their opinions of the official." *Id.* at 1010.

■ Similarly, the context of Overson's statements informed the reader or listener they were merely a continuation of a heated political debate, and the statements did not present a likelihood the audience would form a personal animus towards Mast. In colloquial terms, Overson's statements would necessarily be taken with a grain of salt. In the prepared statement Overson delivered at the press conference, the reader/listener is immediately informed that the comments are part of the ongoing heated debate and made in response to CTU's advertisement. That is, the statement begins by referring to "[t]oday's full page newspaper ad," and contains

such statements as "I've been singled out," and "Mast has attacked my character and integrity." These statements clearly tell the reader/listener that Overson is responding to CTU's newspaper advertisement, and that a key component of his response is to personalize CTU's campaign to Mast in much the same way that CTU had personalized the County's efforts to Overson. The advertisement continued to list various reasons why the South Mountain proposal is good public policy and why there were no irregularities or unlawful conduct in its evaluation and adoption. This additional information further informed the reader/listener that the statements were merely another installment in the continuing heated debate. Thus, as in *West*, the reader/listener would regard the statements as exaggerated and polemicized. Indeed, when responding to a personal attack such as "OVERSON MISLEADS THE PUBLIC," the expectation that the statements would be exaggerated is even higher, thereby reducing further the likelihood that Overson's response would cause personal animus towards Mast on the part of the audience.

Mast points to parts of Overson's prepared statement and his spontaneous comments as reported in local newspapers and argues they suggest criminal conduct and impeach Mast's honesty, integrity, virtue, or reputation. These statements include: "[CTU's] ad is politically motivated, mean spirited and a sham"; "Under the deceptive name of Concerned Taxpayers of Utah, David Mast has attacked my character and integrity";

" 'Concerned Taxpayers of Utah' is a ruse. It's strictly a front for David Mast"; and "[CTU]'s ad is rife with misstatements and bare-faced lies." Mast is correct that possible definitions of these words could be defamatory in particular contexts. However, as in *West*, because these statements were published in the context of a political debate on a public issue and the audience was thus not apt to take them at face value, there was no likelihood of damage to Mast's reputation and the statements, therefore, were not defamatory.[5]

▮▮▮ Regarding Overson's August 26 advertisement entitled "THE FACTS," it is clear that this publication could not have damaged Mast's reputation. The advertisement simply outlines nine points showing the South Mountain project's value to taxpayers, that it was evaluated by various agencies, and that there were no irregularities—such as secret meetings—in its review and approval. The advertisement makes no mention at all of either Mast or CTU and thus makes no statement that could expose Mast to public hatred, contempt, or ridicule. Moreover, when viewed in the context of CTU's August 22 advertisement, the heated public debate preceding its publication, and the earlier press conference, it is clear that "THE FACTS" was a response to criticism— a response that simply illustrated some positive aspects of the South Mountain proposal. Consequently, there was no tendency for Overson's August 26 advertisement to injure Mast's reputation in the eyes of its audience.[6]

5. Particularly telling was Mast's near inability at oral argument to point to concrete ways in which these comments have harmed his reputation, as opposed to CTU's reputation. Indeed, his ability to draw such a strong reaction from Overson and the media is more likely to help—not hurt— efforts at gaining support from like-minded individuals and to solidify his reputation as an effective *community activist.*

6. Related to his Rule 56(f) motion discussed below, Mast asserts a defamation claim based on Overson's spoken comments at the press conference, not contained in his prepared statement or reported in newspaper articles but "that would likely be obtained through proper, orderly discovery." We do not consider such statements because they are absent from the record and Mast has insufficiently alleged them in his complaint. When offending statements are made orally, the cause of action is slander. *See* Utah Code Ann. § 45-2-2(2) (1993); *Baum v. Gillman,* 667 P.2d 41, 42 (Utah 1983). With slander, the plaintiff must either allege special damages or the statements must constitute slander per se. *See Baum,* 667 P.2d at 42–43. Mast failed *to* allege—and no other evidence in the record demonstrates—special damages, and he failed to allege the statements with sufficient particularity to allow us to determine whether they constitute slander per se. Consequently, his action cannot be sustained. *See id.* at 43. *Cf. Larson v. SYSCO Corp.,* 767 P.2d 557, 560 (Utah 1989) ("Speculative injury as to some future difficulty does not give rise to a cause of action as defamatory per se."). Indeed, because a defamation action provides a remedy for concrete harm to one's reputation, plaintiffs who cannot show such damage should, *in any event, refrain from filing suit* precipitously and then hoping to exploit discov-

For the above reasons, we conclude that Overson's statements were not defamatory as a matter of law. The discourse between Mast and Overson is commendable for demonstrating why "debate on public issues should be uninhibited, robust, and wide-open," and statements made in the course of such debate do not become compensable merely because they "include vehement, caustic, and sometimes unpleasantly sharp attacks." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). Consequently, the trial court correctly granted summary judgment to Overson.

## RULE 56(f) MOTION

■ Mast also argues the trial court erred in denying his Rule 56(f) motion because deposing Overson was necessary to "clarify and elucidate" his statements at the press conference. Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Utah R. Civ. P. 56(f). Although they should liberally consider Rule 56(f) motions, trial courts may properly deny such motions "where they are found to be 'lacking in merit.'" *American Towers Owners Assoc. v. CCI Mechanical, Inc.*, 930 P.2d 1182, 1195 (Utah 1996) (quoting *Crossland Sav. v. Hatch*, 877 P.2d 1241, 1243 (Utah 1994)).

■ A Rule 56(f) "movant 'must explain how the continuance will aid his opposition to summary judgment.'" *Id.* (quoting *Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 841 (Utah Ct.App.1987)). Thus, in *American Towers Owners Assoc.*, the Utah Supreme Court held that the trial court did not abuse its discretion in denying a Rule 56(f) motion to continue discovery where the plaintiff's claims failed as a matter of law and where the facts the plaintiff sought to discover were irrelevant to those issues. *See id.* Similarly, as we concluded above, Overson's statements were not defamatory as a matter of law. Because that conclusion disposes of Mast's claims, further discovery clarifying and elucidating Overson's statements is unnecessary.[7] Consequently, the trial court did not abuse its discretion in denying Mast's Rule 56(f) motion.

## CONCLUSION

In sum, because the context of Overson's statements was that of a spirited public debate, where Overson responded to assertions of wrongdoing in Mast's advertisement, there was no likelihood of damage to Mast's reputation and the statements therefore could not sustain a defamatory meaning. Consequently, the trial court correctly granted summary judgment. In addition, because further discovery was irrelevant to the dispositive determination that Overson's statements were

---

ery tools to uncover some previously unknown negative comment. The strengthened version of Rule 11 only bolsters that prescription. *See* Utah R. Civ. P. 11(b) (When presenting a complaint to the court, an attorney certifies "that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances*, ... the allegations and other factual contentions *have evidentiary support* or, *if specifically so identified*, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery ....") (emphasis added).

7. Mast's assertion at oral argument that Overson's deposition was the sole means to prove the exact words Overson uttered during the press conference is unpersuasive. Inasmuch as Mast and others were present during the news conference and thereby had first-hand knowledge of the specific remarks, Mast had various other methods available with which to demonstrate Overson's statements. Mast has not otherwise shown how Overson's deposition would aid his opposition to the summary judgment motion.

not defamatory as a matter of law, the trial court did not abuse its discretion in denying Mast's Rule 56(f) motion.[8]

Affirmed.

DAVIS, Presiding Judge, and JACKSON, Judge, concur.

---

8. Because we conclude the trial court correctly determined that Overson's statements were not defamatory as a matter of law, it is unnecessary for us to examine Overson's numerous additional defenses. Likewise, it is unnecessary for us to remand, as requested by Mast, to develop the record to decide the applicability of those defenses.