**2020 UT App 111**

# THE UTAH COURT OF APPEALS

LYNDA PIPKIN, JANICE LEGLER, BENJAMIN THOMPSON, ROBERT
MCENTEE, ELIZABETH CARLIN, ARTURO MORALES LLAN,
AND PAUL COZZENS,
*Appellants,*

*v.*

DARYL ACUMEN,
*Appellee.*

Opinion
No. 20190378-CA
Filed July 30, 2020

Second District Court, Farmington Department
The Honorable David M. Connors
No. 180700948

Seth D. Needs, Attorney for Appellants

Todd D. Weiler, Attorney for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

ORME, Judge:

¶1     During the period relevant to this lawsuit, Lynda Pipkin, Janice Legler, Benjamin Thompson, Robert McEntee, Elizabeth Carlin, Arturo Morales Llan, and Paul Cozzens (collectively, Plaintiffs) were members or former members of the State Central Committee (SCC), the governing body of the Utah Republican Party (URP). After the SCC adopted a controversial bylaw, Daryl Acumen, who strongly opposed it, sent emails to URP members and posted on social media challenging the bylaw and suggesting its illegality. In these communications, Acumen also alleged that Plaintiffs either supported the bylaw or voted in its

favor. Plaintiffs filed a complaint against Acumen claiming, among other things, defamation and electronic communications harassment. The district court granted summary judgment in Acumen's favor on all their claims, and we affirm.

BACKGROUND[1]

¶2     This case takes place within the larger context of the controversy surrounding the creation of a signature path to the Republican primary ballot—a hotly debated issue within the URP. To make a long story short,[2] in 2014 the Legislature passed SB54 which, when enacted, created a signature-gathering path for candidates to the primary election ballot as an alternative to state nominating conventions and prevented any political party from restricting access to its primary ballot solely to candidates who won nomination through the convention process. *See* Utah Code Ann. § 20A-9-101(12)(c) (LexisNexis 2019) (stating that a qualified political party must allow members "to seek the registered political party's nomination for any elective office by the member choosing to seek the nomination by either or both . . . (i) seeking the nomination through the registered political party's convention process . . . or (ii) seeking the nomination by collecting signatures"); *Utah Republican Party v. Cox*, 2016 UT 17, ¶ 12, 373 P.3d 1286 (per curiam) (concluding that the statute

_____

1. "In reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." *Ockey v. Club Jam*, 2014 UT App 126, ¶ 2 n.2, 328 P.3d 880 (quotation simplified).

2. For a more detailed summary of the events surrounding this public debate, see *Utah Republican Party v. Cox*, 892 F.3d 1066, 1072–75 (10th Cir. 2018).

"requires that, to be a [qualified political party], a registered political party must permit its members to seek access to nomination for electoral office by either or both the signature-gathering method or the convention method"). Although the Legislature was "comprised of overwhelming Republican majorities in both the State House and State Senate," *see Utah Republican Party v. Cox*, 892 F.3d 1066, 1073 (10th Cir. 2018), the URP opposed this legislation.

¶3      On February 24, 2018, after the URP lost two lawsuits challenging SB54's signature provision—and while the appeal from the second suit was pending before the United States Court of Appeals for the Tenth Circuit—the SCC adopted the relevant bylaw (the Bylaw). As the district court stated, "The gist of the Bylaw was that Republican candidates who chose to seek the party's nomination through the signature path allowed by [SB54] would not be allowed to present themselves on the ballot as the Republican party's nominees."[3] The parties agree that

---

3. Oddly, the text of the Bylaw does not appear in the record on appeal. A news article in the record, however, quotes the Bylaw as stating,

> in part, that candidates in the 1st and 2nd congressional districts "who attempt to qualify for the primary ballot through any method not explicitly defined in the Utah Republican Party Constitution and these bylaws will automatically forfeit their party membership in conjunction with the state designated candidate filing-period deadline."

*See* Dennis Romboy, *Surprise GOP Bylaw Change Targets Candidates Who Gather Signatures*, Deseret News (Feb. 26, 2018), https://www.deseret.com/2018/2/26/20640616/surprise-gop -bylaw-change-targets-candidates-who-gather-signatures [https: //perma.cc/C9DZ-839W].

several local media outlets suggested that the Bylaw was possibly illegal.

¶4     Although no official record was made of the vote, and the total number of votes in favor of the Bylaw was unclear, the SCC passed it by a two-thirds majority vote of members who were present at the meeting called to consider the Bylaw.[4] Plaintiffs are members or former members of the SCC who purportedly either voted for or supported the Bylaw.[5]

¶5     Acumen, a former SCC member and the chair of the Utah Black Republican Assembly, vehemently opposed the Bylaw. On March 5, 2018, he sent an email with the subject "Keep the GOP on the ballot!" to URP members. With the exception of links to certain news articles that Acumen included, the email stated as follows:

> An Important Message
> Read if you want to keep the GOP on the ballot
>
> Hello [name],
>
> As you may have heard, on February 24th a small group of delegates to the [SCC] voted to enact a bylaw that currently **threatens to disqualify the [URP] from the 2018 General Election ballot**. The

---

4. Local media reported that "[a]bout 80 of the committee's 180 members attended [the February 24, 2018 meeting], but fewer than that were there to vote on the [Bylaw]." *Id.*

5. Plaintiffs never expressly acknowledged or denied supporting or voting in favor of the Bylaw. Instead, they stated that Acumen "could not have known who voted for the Bylaw because the votes were not made an official record."

bylaw states that Republican candidates who choose to seek our party's nomination through the signature path allowed by current election law will be **"kicked out" of the Republican Party**. Because the bylaw violates the rules for a "Qualified Political Party" (QPP) under Utah state law, the [URP] (along with all our Republican candidates) will almost certainly be removed from the ballot in November as a consequence . . . *this is not a joke!*

The move by a group known as the #GangOf51[6] was taken during a "special" meeting of the SCC called with minimal notice in the hope that few regular committee members would be able to attend. Davis County Republican Party Secretary Brady Jugler proposed the bylaw intentionally to create a legal standoff with the Lt. Governor's office and to place the party's QPP status at risk. These actions violate the [URP] platform, which states **"We support the 'Rule of Law' and believe in upholding the law of the land."**

Because this stunt flouts current election law, it constitutes a **class B misdemeanor** under section

---

6. Acumen at times referred to the "Gang of 51." The origin of the phrase is not entirely clear from the record. In an affidavit, Acumen asserted that he borrowed the term from local media coverage and explained that "[t]he '51' comes from the number of members who called for a special SCC meeting in December 2017." But in its summary judgment order, the district court stated that "[b]oth parties acknowledge [that the term] refer[s] to the majority of SCC members who voted in favor of the Bylaw." In any event, Acumen numbered Plaintiffs among the members of the "Gang of 51."

20A of Utah State Code, punishable by up to six (6) months in jail and a $1,000 fine.

Because the bylaw initially applies only to the 1st and 2nd Congressional races (excluding the 3rd and 4th), it **violates the 14th Amendment to the United States Constitution**, which requires the equal application of election laws. The bylaw also therefore runs afoul of the National Republican Party Platform which urges us to uphold the constitution and proclaims that ". . . the Constitution was written not as a flexible document, but as our enduring *covenant*."

The Utah State Legislature is currently considering **HB485** which would seek to repair the damage by directing the Lt. Governor's office to ignore mid-election bylaw changes by political parties, however the Utah Democratic Party has already signaled that it will challenge this guidance in court and will seek to force the Lt. Governor to recognize the bylaw as written [and] thus **disqualify every Republican from the ballot in 2018**.

The [URP] has three (3) functions:

- **Recruit** Republicans
- **Drive** Republicans to the polls
- **Elect** Republicans

While certain extremists within our party are under the delusion that the primary focus of our party should be to fight against a signature path to the ballot, the vast majority of Republican voters in

Utah and every single Republican leader in the United States disagrees.

By jeopardizing our place on the 2018 ballot, our SCC representatives have acted **illegally, irresponsibly, recklessly,** and against our interests. They have violated our trust and I believe they should be held accountable.

**If you agree with me**, please contact the SCC members responsible for this action by sending an email expressing your thoughts and opinions on the matter to GangOf51@UtahGOP.org. Alternatively you can simply reply to this email and your response will be directed to those responsible.

**Thank you** for your attention.

The bottom of the email also contained an "Unsubscribe here" link.

¶6     Two weeks later, on March 19, 2018, Acumen sent out a similar email with the subject line "Important Information for Caucus Night." This email contained a link to a website that listed the alleged members of the Gang of 51, including Plaintiffs. Acumen also posted on social media, "If you want to let the #GangOf51 know how you feel about their illegal activity, you can email them all . . . . I encourage everyone reading this to send them a quick note letting them know exactly what you think!"

¶7     In an affidavit, Acumen stated that he "sent a total of 67,660 emails to party members and only 12,870 of them were opened[,] . . . generat[ing] about 600 responses that were

redirected to Plaintiffs and other members of the 'Gang of 51.'" This statement was essentially undisputed by Plaintiffs.[7]

¶8 In September 2018, Plaintiffs filed their lawsuit against Acumen, asserting claims of electronic communications harassment, defamation, false light, and intentional infliction of emotional distress (IIED). Acumen moved to dismiss their complaint. Following oral argument, the district court converted Acumen's motion to dismiss into a motion for summary judgment on the ground that Acumen's motion and Plaintiffs' reply memorandum raised "matters outside the pleading." *See* Utah R. Civ. P. 12(b) ("If . . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment[.]").

¶9 After providing the parties with a "reasonable opportunity to present all material made pertinent to such a motion," *id.*, the court granted summary judgment in Acumen's favor. The court first addressed Plaintiffs' electronic

---

7. Pipkin stated in her affidavit that Acumen's "actions caused [her] and the other Plaintiffs to receive hundreds, if not thousands, of emails over a several day period from individuals responding to [Acumen's] . . . emails." As a result, Pipkin claimed that their "email systems were overloaded and [they] were effectively unable to use [their] email or conduct [their] business as normal." She also stated that Acumen "ignored [their] requests to stop with the emails." The district court, however, did not credit these statements and noted that "[g]iven the[] very general responses by [Pipkin to Acumen's affidavit], for purposes of its review of the present motion [for summary judgment,] the Court considers the numbers asserted by . . . Acumen (67,660 email recipients, 12,870 emails opened, and 600 responses directed to Plaintiffs) to not be subject to genuine dispute."

communications harassment claim, noting that "[t]he 600 responses that were directed to the Plaintiffs came from their constituents, not from . . . Acumen." But "[e]ven if all 600 responses were copied to every member of the Plaintiff group, which is unclear," the court "conclude[d], as a matter of law, that [Acumen's] action in sending his email to Plaintiffs' constituents was not intended to, and did not actually, 'cause[] disruption, jamming, or overload of an electronic communication system.'" *See* Utah Code Ann. § 76-9-201(2)(d) (LexisNexis 2017). Furthermore, the court concluded that the subject matter of Acumen's email communications "falls squarely within the statutory exception for communications made for legitimate business purposes." *See id.* § 76-9-201(5)(b).

¶10 Addressing Plaintiffs' claims for defamation, false light, and IIED, the court noted that the claims "all rely fundamentally on Plaintiffs' assertion that [Acumen] accused Plaintiffs of committing a crime by voting for the Bylaw." It concluded that those claims failed as a matter of law because Acumen "at most . . . asserted that the SCC action of adopting the contested Bylaw would be a Class B misdemeanor violation of a law prohibiting interference with the electoral process," and he did not "assert that any individual plaintiff violated any criminal law." Thus, although the court "hasten[ed] to indicate that it does not condone the statements made by [Acumen], particularly the implication that there may have been something 'illegal' going on," it dismissed Plaintiffs' complaint on the ground that Acumen's emails and social media post "were not actionable."

¶11 Plaintiffs appeal.


ISSUES AND STANDARDS OF REVIEW

¶12 Plaintiffs challenge the district court's grant of summary judgment in favor of Acumen on their defamation, false light,

IIED, and electronic communications harassment claims. Generally, "we review a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness, viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party," and we apply this standard to Plaintiffs' electronic communications harassment claim. *Heartwood Home Health & Hospice LLC v. Huber*, 2020 UT App 13, ¶ 11, 459 P.3d 1060 (quotation simplified).

¶13 But "the First Amendment demands a subtle although significant variation in the treatment of inferences drawn from undisputed facts" for Plaintiffs' defamation, false light, and IIED claims. *See Jacob v. Bezzant*, 2009 UT 37, ¶ 18, 212 P.3d 535 (quotation simplified). *See also id.* ¶ 21 ("A false light claim is closely allied with an action for defamation, and the same considerations apply to each.") (quotation simplified); *Davidson v. Baird*, 2019 UT App 8, ¶ 57, 438 P.3d 928 ("Where an [IIED] claim is based on the same facts as a claim for defamation, appropriate concern for the First Amendment rights of the parties must be considered.") (quotation simplified). "To accommodate the respect we accord its protections of speech, the First Amendment's presence merits altering our customary rules of review by denying a nonmoving party the benefit of a favorable interpretation of factual inferences." *Bezzant*, 2009 UT 37, ¶ 18 (quotation simplified). *See Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988) (stating that the First Amendment favors "disposing of [defamation] cases on motion and at an early stage when it appears that a reasonable jury could not find for the plaintiffs"). Accordingly, whether a challenged statement is susceptible to a defamatory interpretation is a question of law that we consider de novo without "indulging inferences in favor of the nonmoving party." *O'Connor v. Burningham*, 2007 UT 58, ¶ 27, 165 P.3d 1214.

ANALYSIS

¶14 Summary judgment is appropriate when (1) "there is no genuine dispute as to any material fact" and (2) "the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). Because Plaintiffs do not challenge the district court's ruling on the first prong,[8] we limit our review to whether Acumen was "entitled to judgment as a matter of law" on each of Plaintiffs' claims.

I. Defamation

¶15 "Defamation is the act of harming the reputation of another by making a false statement to a third person."[9] *Jensen v.*

---

8. Concerning their electronic communications harassment claim, Plaintiffs assert that there is a factual dispute as to whether the 600 emails they received overloaded their email systems. The district court concluded, "as a matter of law," that the emails "did not actually 'cause disruption, jamming, or overload of an electronic communication system.'" And in any event, because we conclude that the "legitimate business purpose" exemption applies to this case, this alleged factual dispute is immaterial to our resolution of the issue. *See infra* section II.

9. Defamation encompasses both libel and slander, which are distinguished by the manner of an actionable statement's publication. *Jensen v. Sawyers*, 2005 UT 81, ¶ 33 n.6, 130 P.3d 325. "Slander consists of the publication of defamatory matter by spoken words, transitory gestures or by any form of communication other than libel. Libel consists of the publication of defamatory matter by written or printed words in physical form or by any other form of communication that has the potentially harmful qualities characteristic of written or printed

(continued…)

*Sawyers*, 2005 UT 81, ¶ 35, 130 P.3d 325. *See West v. Thompson Newspapers*, 872 P.2d 999, 1008 (Utah 1994) ("At its core, an action for defamation is intended to protect an individual's interest in maintaining a good reputation."). A false statement harms an individual's reputation if it "impeaches [the] individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule." *West*, 872 P.2d at 1008. But the First Amendment, which "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (quotation simplified), significantly limits the tort, *see Jensen*, 2005 UT 81, ¶ 50 ("Defamation claims always reside in the shadow of the First Amendment."). Over time, the tension between the First Amendment and laws designed to protect individual reputation has resulted in the development of "a considerable assortment of defenses, privileges, heightened burdens of proof, and particularized standards of review." *Id.*

¶16    To prevail on a claim of defamation, a plaintiff must show that "(1) the defendant published the statements [in print or orally] concerning [the plaintiff]; (2) the statements were false;[10]

---

(…continued)
words." *Id.* (quotation simplified). *See also* Utah Code Ann. § 45-2-2(1)–(2) (LexisNexis 2018) (defining libel as "a malicious defamation, expressed either by printing or by signs or pictures or the like," and slander as "any libel communicated by spoken words").

10. Falsity is usually presumed, and truth is an affirmative defense that the defendant bears the burden of proving to defeat the claim on this basis. *Davidson v. Baird*, 2019 UT App 8, ¶ 25 n.3, 438 P.3d 928. "But where the plaintiff is a public figure or the statement involves a matter of public concern, it is the plaintiff

(continued…)

(3) the statements were not subject to privilege; (4) the statements were published with the requisite degree of fault; and (5) the statements resulted in damages." *DeBry v. Godbe*, 1999 UT 111, ¶ 8, 992 P.2d 979. *See West*, 872 P.2d at 1007–08. But before the matter may proceed to the trier of fact, the court must initially determine whether, as a matter of law, the challenged statement "is capable of conveying a defamatory message." *Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988). In making this determination, a court cannot limit its analysis to isolated words or sentences. Instead, it "must weigh competing definitions and make sense of context" without "indulging inferences in favor of the nonmoving party," *O'Connor v. Burningham*, 2007 UT 58, ¶ 27, 165 P.3d 1214, and decide whether the statement tends "to injure [the plaintiff's] reputation in the eyes of its audience," *West*, 872 P.2d at 1008.

¶17 Plaintiffs assert, with our emphasis, that Acumen "accused the Gang of 51 of acting criminally for *voting* for the

---

(…continued)
who must shoulder the burden in his case-in-chief of proving the falsity of the challenged statement." *Id.* (quotation simplified). Here, Plaintiffs contend that they were private figures and not public officials or public figures. We do not address this particular issue because the Bylaw, which expressly governed a political candidate's ability to be listed on a ballot as a member of a major political party, is unquestionably a matter of public concern. *Cf. Wayment v. Clear Channel Broad., Inc.*, 2005 UT 25, ¶ 35, 116 P.3d 271 ("If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy.") (quotation simplified). In any event, we assume that the challenged statements were false and do not base our decision on this prong. *See infra* ¶ 17.

Bylaw."[11] In support of this contention, they quote Acumen's emails in which he "stated that the Gang of 51's actions or 'stunt flouts current election law, it constitutes a class B misdemeanor under section 20A of Utah State Code, punishable by up to six (6) months in jail and a $1,000 fine,'" and that "the 'SCC representatives have acted illegally, irresponsibly, recklessly, and against our interests.'" They also point to a social media post in which Acumen stated, "If you want to, let the #GangOf51 know how you feel about their illegal activity[.]" We assume, without deciding, that the challenged statements were false. But having carefully considered the context in which Acumen sent the emails and posted on social media, and the statements contained therein, we conclude that the challenged statements were not susceptible to defamatory interpretation.

¶18 Acumen's emails and social media post were unquestionably political speech, which "enjoys the broadest protection under the First Amendment." *See Jacob v. Bezzant*, 2009 UT 37, ¶ 29, 212 P.3d 535. *See also Sullivan*, 376 U.S. at 270–72 (stating that "debate on public issues should be uninhibited, robust, and wide-open" and that "erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the breathing space that they need to survive") (quotation simplified). Acumen published the challenged statements within the larger context of a hotly debated public issue—the signature path to the primary ballot. At that time, the URP had initiated and lost two challenges to SB54's signature-gathering provision and emotions

---

11. Plaintiffs argue that although Acumen "did provide a few news articles that mentioned only the possibility of the Bylaw being illegal, . . . those articles never once mentioned the possibility that voting for the Bylaw was criminal or illegal conduct," as they contend Acumen had alleged.

were undoubtedly high. *See Utah Republican Party v. Cox*, 892 F.3d 1066, 1073–75 (10th Cir. 2018). And Plaintiffs implicitly acknowledge that the Bylaw was a well-known issue within URP circles, stating that even without Acumen's second email containing a link to a list of members of the Gang of 51, Plaintiffs "were [already] widely known throughout the [URP] as members of the Gang of 51 during the time that [Acumen] sent his emails."

¶19    Acumen's emails critiqued the propriety of the Bylaw allowing the URP to expel party members who made it onto the URP primary ballot via the signature-gathering route. Thus, Acumen's readers would have been aware that the challenged statements were a continuation of the signature-path debate. And given the readers' understanding that Acumen's emails and social media post were part of that heated public debate, they would have taken them "with a grain of salt," regarding them "as exaggerated and polemicized." *See Mast v. Overson*, 971 P.2d 928, 932–33 (Utah Ct. App. 1998).

¶20    Additionally, Acumen sent the emails in the familiar format of a political email, similar to those that political candidates or parties send attacking their opponents and seeking contributions.[12] The political nature of the emails was clear from the subject line of the emails: "Keep the GOP on the ballot!" and "Important Information for Caucus Night." The body of the emails contained large headings set against a backdrop stating, "An Important Message: Read if you want to keep the GOP on the ballot," and "Background Information for Caucus Attendees: How to protect the Republican Party from Extremists," respectively. The liberal use of bold font, inclusion of links to news articles, and other formatting choices in the emails likewise

12. This may explain why only 12,870 out of 67,660 recipients of the emails even opened them.

alerted their readers to their overtly political nature. Finally, the bottom of each email contained a link labeled "Unsubscribe here." Given the readily apparent political nature of the emails, readers would expect exaggerated commentary and accusations, rendering them less likely to take the statements at face value. *See West*, 872 P.2d at 1010 (stating that readers expect exaggerated commentary and criticism of public officials in editorial articles "and are therefore less likely to rely on [such articles] in forming their opinions").

¶21 Taken as a whole, the context of the vigorous debate concerning the signature path to the ballot and the format of the challenged statements would have placed readers on notice that the emails contained exaggerated commentary, rendering it unlikely that the challenged statements would cause the readers to "form a personal animus towards" Plaintiffs. *See Mast*, 971 P.2d at 932.

¶22 Furthermore, we agree with the district court that Acumen "never accused any individual of committing a crime" because, with our emphasis, "at most, [Acumen] asserted that *the SCC's action* of adopting the contested Bylaw would be a Class B misdemeanor violation of a law prohibiting interference with the electoral process." The emails stated that "a small group of delegates to the [SCC],"[13] whom Acumen referred to later in the emails as the Gang of 51, "voted to enact a bylaw" that "violates the rules for a 'Qualified Political Party' . . . under Utah state law." He also stated that "[b]ecause this stunt flouts current election law, it constitutes a class B misdemeanor under section 20A of Utah State Code, punishable by up to six (6) months in jail and a $1,000 fine." But the "stunt" to which Acumen referred was the *SCC's adoption of the Bylaw*, not any member's individual

---

13. In his second email, Acumen referred to the Gang of 51 as "a small group of extremists on the [SCC]."

vote in favor thereof. No reasonable reader would understand the emails to suggest that the mere vote in favor, irrespective of whether the Bylaw ultimately passed, would constitute a class B misdemeanor or otherwise be illegal conduct. Rather, at most, it was the SCC majority's *adoption* of the Bylaw that could potentially be construed as the illegal activity, although it is more likely that readers would understand the emails to suggest that the actual enforcement of the Bylaw would be what allegedly "flout[ed] current election law."

¶23    Plaintiffs also point out that Acumen asserted that "[b]y jeopardizing our place on the 2018 ballot, our SCC representatives have acted illegally, irresponsibly, recklessly, and against our interests," and that he authored a social media post in which he stated, "If you want to, let the #GangOf51 know how you feel about their illegal activity[.]" As stated above, however, courts do not limit their analysis to isolated words or sentences when determining whether a publication is capable of sustaining a defamatory interpretation. Acumen stated in his emails that SCC representatives acted illegally "[b]y jeopardizing our place on the 2018 ballot." Clearly then, his readers would not understand the individual act of voting in favor of the Bylaw to be illegal because this alone would not have "jeopardiz[ed] [the URP's] place on the 2018 ballot" if the SCC had ultimately not adopted the Bylaw. Given the larger context in which Acumen sent the emails and the text of the emails taken as a whole, these statements cannot be construed to suggest that any individual vote in favor of the Bylaw was "illegal." Rather, at most, the statements were yet another reference to the SCC majority's collective adoption of the Bylaw.

¶24    For the reasons stated above, we conclude that the challenged statements in Acumen's emails and social media post were not susceptible to defamatory interpretation as a matter of

law. The district court therefore properly granted summary judgment in Acumen's favor on this claim.[14]

## II. Electronic Communications Harassment

¶25 A person commits electronic communications harassment if, "with intent to intimidate, abuse, threaten, harass, frighten, or disrupt the electronic communications of another, the person," among other things, "causes disruption, jamming, or overload of an electronic communication system through excessive message traffic or other means utilizing an electronic communication device" or, "after the recipient has requested or informed the person not to contact the recipient, . . . the person repeatedly or

---

14. Because Plaintiffs' false light and IIED claims are also premised on the assertion that Acumen falsely accused them of acting illegally by voting in favor of the Bylaw, we likewise affirm the district court's grant of summary judgment in Acumen's favor on those claims. Concerning the false light claim, because Acumen at most accused the SCC of acting illegally in adopting the Bylaw, and because local media outlets reporting on the Bylaw had already suggested that it was "possibly illegal," Plaintiffs cannot establish that Acumen, a layperson, "knew or recklessly disregarded the falsity of the publicized matter." *See Jacob v. Bezzant*, 2009 UT 37, ¶ 21, 212 P.3d 535.

The same reasoning applies to Plaintiffs' IIED claim, which fails because Acumen did not actually engage in the conduct that Plaintiffs claim. Furthermore, even assuming that Acumen had accused Plaintiffs of acting criminally by voting in favor of the Bylaw, such conduct does not, in this robust political context, "evoke outrage or revulsion" and therefore cannot "reasonably be regarded as so extreme and outrageous as to permit recovery." *See Chard v. Chard*, 2019 UT App 209, ¶ 57, 456 P.3d 776 (quotation simplified).

continuously . . . causes an electronic communication device of the recipient to ring or to receive other notification of attempted contact by means of electronic communication."[15] Utah Code Ann. § 76-9-201(2)(a), (d) (LexisNexis 2017). The statute also provides an exemption, stating that it "does not create a civil cause of action based on electronic communications made for legitimate business purposes," *id.* § 76-9-201(5)(b), but does not define the key phrase, "legitimate business purposes."

¶26    Plaintiffs contend that Acumen's emails to URP members and social media post do not fall under the business purpose exemption. Citing Black's Law Dictionary, they argue that "a business purpose would involve those actions related to one's livelihood or earning a profit." *See Business*, Black's Law Dictionary 239 (10th ed. 2014) (defining "business" as "[a] commercial enterprise carried on for profits; a particular occupation or employment habitually engaged in for livelihood or gain"). And because Acumen never stated "that he sent his emails for purposes related to his livelihood or earning of profit," Plaintiffs contend that he could not have sent the emails for a legitimate *business* purpose.[16] We decline to adopt such a narrow definition of "legitimate business purposes."

---

15. We note that the United States District Court for the District of Utah recently concluded that the electronic communications harassment statute—a criminal statute—does not authorize a private cause of action. *See Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1237–38 (D. Utah 2018). Utah appellate courts have yet to address this issue, and because we conclude that the legitimate business exemption applies to Acumen's emails and social media post in any event, we do not reach it here.

16. Plaintiffs also argue that "a legitimate purpose would generally be described as doing something that is legal and

(continued…)

¶27 Even assuming, without deciding, that the 600 emails URP members sent to Plaintiffs can be attributed to Acumen under the statute, Plaintiffs' argument is unavailing because Acumen's emails and social media post clearly concerned URP business—even absent economic implications. Although the definition of "business," as Plaintiffs point out, often involves profit and livelihood, it is not the only definition of the term. "Business" can likewise be defined as "an activity that someone is engaged in," "a person's concern," and "work that has to be done or matters that have to be attended to." *Business*, New Oxford American Dictionary 237 (3d ed. 2010). *See Business*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/business [https://perma.cc/7PZB-2Q4F] (defining "business" as a "role [or] function," "an immediate task or objective," and "a particular field of endeavor").

¶28 Here, the SCC, acting as the representative body of the URP, adopted the Bylaw—a document typical of business. Acumen then sent the emails to the SCC's constituents[17] and posted on social media discussing what he believed to be the Bylaw's harmful implications. This content dealt directly with the "business" of the SCC and the URP and therefore falls squarely within the statutory "legitimate business purpose" exemption. Otherwise, under Plaintiffs' limited definition, all leaders of campaigns encouraging constituents to contact their elected officials to urge them to vote in a certain manner, or to

(…continued)
proper," which Acumen's publications could not have been because they were defamatory. But as discussed in section I, Acumen's emails and social media post were not defamatory as a matter of law, and this argument therefore fails.

17. Generally, SCC members are elected at URP county conventions.

criticize an official's recent vote, would be subject to liability under the electronic communications harassment statute. Such an interpretation of the statute would raise serious constitutional questions, and we therefore decline to read Plaintiffs' desired definition into the statute. *See Castro v. Lemus*, 2019 UT 71, ¶ 54, 456 P.3d 750 ("Under the canon of constitutional avoidance, courts may reject one of two plausible constructions of a statute on the ground that it would raise grave doubts as to the statute's constitutionality. . . . In applying the canon of constitutional avoidance, we presume that the legislature either prefers not to press the limits of the Constitution in its statutes, or it prefers a narrowed (and constitutional) version of its statutes to a statute completely stricken by the courts.") (quotation simplified).

¶29 For this reason, the district court properly granted summary judgment in Acumen's favor on Plaintiffs' electronic communications harassment claim.

## CONCLUSION

¶30 The district court did not err in granting summary judgment in favor of Acumen on Plaintiffs' defamation, false light, and IIED claims because, given the context and format in which Acumen sent his emails and made his social media post and based on an examination of the publications as a whole, Acumen could not reasonably be said to have accused Plaintiffs of illegal activity simply for voting in favor of the Bylaw. Plaintiffs' claim for electronic communications harassment likewise fails because Acumen sent the emails and made the social media post for a legitimate business purpose.

¶31 Affirmed.

———————